## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**ANTONIO PROPHET,**

      **Petitioner,**

**v.**                                                            **Civil Action No. 1:16cv178**
                                                   **(Judge Kleeh)**

**RALPH TERRY, Acting Warden,**

      **Respondent.**

## <u>REPORT AND RECOMMENDATION</u>

This case was initiated by the *pro se* Petitioner on August 24, 2016, by the filing of a petition for habeas corpus pursuant to 28 U.S.C. § 2254.  The petition was not on a court-approved form and comprised 806 pages, including memoranda and attachments. Along with the petition, Petitioner paid the filing fee and filed a Motion for Expedited Review. ECF Nos. 2, 3. The following day, pursuant to Rule 4 of the Federal Rules Governing Section 2254 Proceedings in the United States District Court, Magistrate Judge James E. Seibert made a preliminary review of the petition and found that summary dismissal was not warranted at that time.  Accordingly, the Respondent was directed to file an answer to the petition. ECF No. 5.  On August 29, 2016, the Respondent moved for an extension of time.  ECF No. 7. By Order entered the same day, Petitioner was directed to show cause; his over-large § 2254 petition was struck for failure to comply with the Local Rules of Prisoner Litigation Procedure ("LR PL P"); the attachments to the petition were struck; Petitioner's motion for expedited review was denied; and the prior order directing Respondent to answer was vacated.  ECF No. 10.  By separate Order entered the same day, Respondent's motion for an extension was denied as moot.  ECF No. 9.

On September 2, 2016, Petitioner refiled his § 2254 petition, with a 7-page typed "addendum" and three attached exhibits;[1] along with a motion to proceed as a pauper; a copy of his Prisoner Trust Account Report; a response to the order to show cause; a Motion for Leave to Type 2254 on the Uploaded Court-Approved Form; and a Motion for Leave to File Excess Pages. ECF Nos. 13, 14, 15, 16, 17, 18.

On October 31, 2016, along with a Motion for the Court to Forthwith Direct the Respondent to File an Answer to Petitioner's Initial or Modified 2254 Petition [ECF No. 20], Petitioner filed a Renewed Motion for Expedited Review of his § 2254 petition.  ECF No. 21. By Order entered November 2, 2016, Petitioner's motion to type his § 2254 petition on an uploaded court approved form and his motion for leave to file excess pages were granted, and Petitioner was directed to file a memorandum of law, if any, not to exceed fifty pages. ECF No. 22. By separate Order entered the same day, Petitioner's renewed motion for expedited review was denied. ECF No. 23.

On November 9, 2016, Petitioner filed a 56-page Memorandum of Law in support of his § 2254 petition. ECF No. 25.

On December 2, 2016, Petitioner filed another Renewed Motion for the Court to Forthwith Direct the Respondent to File an Answer.  ECF No. 26.  On December 5, 2016, the Respondent filed a response in opposition, along with a motion to strike Petitioner's memorandum of law.  ECF No. 27.  Petitioner filed a reply on December 8, 2017. ECF No. 28.

---

[1] Petitioner attached copies of: a June 21, 2016 Memorandum Decision of the West Virginia Supreme Court of Appeals on the appeal of three Circuit Court of Berkeley County orders entered in his state habeas petition; a June 24, 2015 Order from the Circuit Court of Berkeley County, dismissing certain grounds in his state habeas petition; and an October 28, 2015 Order from the Circuit Court of Berkeley County, denying his state habeas petition.  ECF Nos. 13-2, 13-3, and 13-4.

On January 18, 2017, Petitioner filed a Renewed Motion for the Court to Forthwith Direct the Respondent to File an Answer. ECF No. 29.  On March 21, 2017, Petitioner filed a Motion for the District Judge to Direct the Magistrate Judge to Forthwith Order the Respondent to File an Answer.  ECF No. 35.  By Order entered March 29, 2017, Petitioner's motion and renewed motion to direct the Respondent to file an answer were denied; Respondent's motion to strike Petitioner's memorandum of law was granted, and Petitioner was again directed to refile his memorandum in support in compliance with the LR PL P.  See ECF No. 36. By Order entered March 30, 2017, Petitioner's Motion for the District Judge to Direct the Magistrate Judge to Forthwith Order the Respondent to File an Answer was denied as moot. ECF No. 37.  On March 31, 2017, Petitioner filed a response to the March 29, 2017 Order, withdrawing his Memorandum of law; waiving the right to file another; and requesting the Court to forthwith direct the Respondent to file an answer only to his § 2254 petition. ECF No. 38.  On April 27, 2017, Petitioner filed a Motion for the Court to Forthwith Order the Respondent to File an Answer and to Expedite Review.  ECF No. 41.

By Order entered May 2, 2017, the Respondent was directed to show cause why the petition should not be granted; Petitioner's motion for the court to forthwith direct the Respondent to file an answer was denied as moot, and Petitioner's motion to expedite review was denied as premature. ECF No. 42. That same day, the Respondent moved for an extension of time to file an answer. ECF No. 43.  By Order entered May 3, 2017, Respondent's motion for an extension was granted. ECF No. 44.  On July 24, 2017, Respondent filed a second motion for an extension of time. ECF No. 48.  On July 27, 2017, Petitioner filed an objection to Respondent's second motion for an extension.  ECF No. 49.  On July 27, 2017, Respondent filed a reply to Petitioner's objection. ECF No. 50.  On August 16, 2017, Respondent filed a motion for leave to file out of time; a Response; a Motion to Dismiss for Failure to Exhaust; a Memorandum in Support; and a Motion for leave to

file excess pages.  ECF Nos. 51, 52, 53, 55, 54.  By Order entered August 21, 2017, Respondent's motion for leave to file out of time was granted, and Respondent's prior motion for an extension of time was denied as moot.  ECF No. 56. By separate Order entered the same day, Respondent's motion to exceed the page limits was granted. ECF No. 57.  Because Petitioner was proceeding *pro se*, on August 22, 2017, a <u>Roseboro</u> Notice was entered.  ECF No. 58.  On August 28, 2017, Petitioner filed a Response in Opposition to Respondent's Motion to Dismiss and a Reply; the two documents together exceeded the LR PL P limitation of pages by 5 pages and were filed without a motion to exceed the page limit.  ECF Nos. 61, 62.  Along with those two responses, Petitioner filed another Motion for the Court to Expedite Review of the Matter of Exhaustion and Order the Respondent to Forthwith File an Answer Addressing the Allegations in Petitioner's § 2254 Petition. ECF No. 63. By Order entered August 30, 2017, Petitioner's third renewed motion for expedited review was denied as premature.  ECF No. 64.

By Order entered September 15, 2017, this case was reassigned from Magistrate Judge James E. Seibert to Magistrate Judge Michael J. Aloi.

On September 27, 2017, Petitioner filed a Clarified Motion for the Court to Expedite Review of the Matter of Exhaustion and Order the Respondent to Forthwith File an Answer Addressing the Allegations in Petitioner's § 2254 Petition.  ECF No. 66. On November 2, 2017, Petitioner filed a Motion for the District Judge to Direct the Magistrate Judge to Expedite Review of the Matter of Exhaustion and Order the Respondent to Forthwith File an Answer Addressing the Allegations in Petitioner's § 2254 Petition. ECF No. 67.

On February 6, 2018, the undersigned issued a Report and Recommendation, ("RR") recommending that Respondent's Motion to Dismiss [ECF No. 53] be granted, that the petition be denied and dismissed without prejudice as unexhausted; and that Petitioner's two pending motions,

Clarified Motion for the Court to Expedite Review of the Matter of Exhaustion and Order the Respondent to Forthwith File an Answer Addressing the Allegations in Petitioner's § 2254 Petition [ECF No. 66] and Motion for the District Judge to Direct the Magistrate Judge to Expedite Review of the Matter of Exhaustion and Order the Respondent to Forthwith File an Answer Addressing the Allegations in Petitioner's § 2254 Petition [ECF No. 67] both be denied as moot. On February 20, 2018, Petitioner filed a motion for leave to exceed the page limits and objections to the R&R. ECF No. 71.

By Memorandum Opinion and Order issued on March 28, 2018, the R&R was adopted to the extent that Grounds 10(14), 12(3) and 12(4) of the Petition were found to be unexhausted, and Grounds 1 and 2 to be procedurally barred; concluding that Petitioner had abandoned the unexhausted Grounds 10(14), 12(3) and 12(4); dismissing with prejudice Grounds 1 and 2; denying as moot the Respondent's motion to dismiss; denying as moot Petitioner's clarified motion for the Court to expedite review; denying as moot Petitioner's motion for the district judge to direct the magistrate judge to expedite review; granting Petitioner's motion for leave to exceed the page limit; and recommitting the case to the undersigned for consideration of the merits of Petitioner's remaining claims:[2] Grounds 3-9, 10(1)-10(13), 10(15)-10(16), 11, 12(1)-12(3),[3] and 13.

---

[2] This analysis of which claims remain for consideration reflects that Petitioner also agreed to "willingly abandon[]" Grounds 10(17) and "12(15) [sic]" because they "lack merit." See ECF No. 61, n.1 at 2. Because there is no Ground 12(15) in the petition, and it is clear that Petitioner was referring to the claim of appellate assistance of counsel raised in Ground 12(5), it appears that this was a typographical error on Petitioner's part.

     Petitioner's abandonment of the Grounds 10(17) claims also specifically includes abandonment of the claims labeled as Ground 10(r), Ground 10(s), and Ground 10(q)(6) in the R&R. See ECF No. 61 at 5 – 6.

     Petitioner also indicated his willingness to abandon the implicitly-raised claim of appellate counsel's ineffectiveness for failing to challenge the circuit court's refusal to transfer his trial due to prejudicial pretrial publicity [see ECF No. 61 at 6]; referencing it as Ground 12(5); this claim was actually labeled "Ground 12(f)" in the R&R [see ECF No. 68 at 38]; this appears to be another typographical error by Petitioner.

[3] This appears to be a typographical error in the Order, given that Ground 12(3) was specifically noted to have been abandoned by Petitioner. *Cf.* ECF No. 73, n1 at 2, 30 *with* id. at 18, 29.

On April 3, 2018, a second Order to Show cause was entered. ECF No. 75. On April 5, 2018, Petitioner filed a "Motion for the District Judge to Independently Consider and Decide the Merits of Petitioner's Remaining § 2254 Habeas Corpus Claims." ECF No. 76. The motion was construed as a motion for recusal of the magistrate judge and was denied by Order entered April 25, 2018. ECF No. 78.

On May 3, 2018, the Respondent filed a Supplemental Response, a Motion for Summary Judgment, a Memorandum in Support, and a motion to substitute party.  ECF Nos. 80, 81, 82, 83. By Order entered May 4, 2018, Respondent's motion to substitute party was granted. ECF No. 84. A second <u>Roseboro</u> Notice issued. ECF No. 85. On May 17, 2018, Petitioner filed a motion to exceed the page limit.  ECF No. 88. By Order entered May 31, 2018, Petitioner's motion to exceed the page limits was granted.  ECF No. 89. That same day, Petitioner filed a Memorandum of Law in response to Respondent's motion for summary judgment. ECF No. 90.

On September 28, 2018, Petitioner filed another motion to expedite review.  ECF No. 93.

By Miscellaneous Case Order entered November 30, 2018, this case was reassigned from District Judge Irene M. Keeley to District Judge Thomas S. Kleeh.

Accordingly, this case is again before the undersigned for a report and recommendation pursuant to LR PL P 2.

## I.   <u>Factual and Procedural Background</u>

### A.   <u>Petitioner's Conviction and Sentence</u>

On June 5, 2010, Petitioner spent the night with his girlfriend, Angela Devonshire, and her two young children[4] in her apartment above her parents' garage in Berkeley County, West Virginia. <u>See</u> West Virginia Supreme Court of Appeals' ("WVSCA") June 5, 2014 opinion on

---

[4] Petitioner was not the father of either child.

6

direct appeal, ECF No. 52-15 at 7.  The garage apartment was located at the end of Devonshire's parents' driveway, approximately 75 yards from their home. Id.  At some point before 4:36 a.m. on June 6, 2010, Petitioner slit Ms. Devonshire's throat and then burned the apartment with Ms. Devonshire and her three-year-old son Andre still inside.[5] Id. at 7 - 8. Petitioner carried Ms. Devonshire's other son, Daronte, an infant approximately six weeks old, out of the apartment and over to Devonshire's parents' nearby patio, where he left him,[6] unattended but alive. Id. at 8, 12. The infant was uninjured; however, blood spatter on his clothing was later confirmed to be Petitioner's. Id. at 8. Petitioner, using an assumed name, attempted to flee to Georgia [ECF No. 52-20 at 2], but was apprehended in North Carolina on June 17, 2010. ECF No. 52-15 at 8; see also ECF No. 52-5 at 50 – 51, 53. At the time of his arrest, Petitioner's hands exhibited defensive injuries. ECF No. 52-15 at 8.

Accordingly, on February 17, 2011, a grand jury sitting within the Circuit Court of Berkeley County, West Virginia ("circuit court") indicted Petitioner in Criminal Case No. 11-F-67 on two counts of first-degree murder for the deaths of Ms. Devonshire and her son, and one count of first-degree arson. ECF No. 52-1.

Approximately two years after the murders/arson, at the July, 2012 trial,[7] the State of West Virginia ("state") introduced witnesses who testified that Petitioner had a cut on his neck, blood

---

[5] At trial, the medical examiner testified that both were dead before the fire started; Angela's throat was slit so deeply that her airway was transected and she bled to death; her body was so charred, it only weighed 60 pounds. However, Andre's body was too badly burned to determine a cause of death. See ECF No. 52-29 at 95 – 101.  At trial, Petitioner contended two intruders committed the crimes.
 As noted by the WVSCA in its *per curiam* opinion, "[a] reasonable person could infer that after killing Angela, the petitioner killed Andre because the petitioner knew that Andre, but not infant Daronte, could identify him, which is evidence of premeditation." See ECF No. 52-15 at 19.

[6] At trial, Prophet testified that he left the baby on a lawn chair on the patio in back of the home. ECF No. 52-30 at 309.

[7] Petitioner's trial counsel were B. Craig Manford and Christopher Prezioso.

on his clothing, appeared disturbed, distraught, and was sweating at 7:00 a.m. on the morning of June 6, 2010, after the murder/arson; that Petitioner requested clothes, a cell phone, and money from an ex-girlfriend on the morning of the murder/arson; that he sought transportation out of state; that he had requested help from a friend named Joseph Medina,[8] after texting him that he "was in a situation;" and that blood on the infant's clothing matched Petitioner's. ECF No. 52-15 at 8-9.

Petitioner testified in his own defense, alleging that the deaths were the result of a drug-related hit targeting Ms. Devonshire, purportedly because of money she allegedly owed Joseph Medina.[9]  See id. at 10 – 12. Specifically, Petitioner testified that two men broke into Ms. Devonshire's apartment that night and slit her and her three-year-old son's throats while Petitioner attempted to fight them off.[10]  Id.; see also ECF No. 52-30 at 300 - 01. However, Petitioner's

---

[8] At trial, Medina testified that he had been a friend of Prophet's since early grade school. See ECF No. 52-15 at 9.

[9] Petitioner testified that he and Medina quarreled in the days leading up to the murders/arson, allegedly over a laptop that Medina had stolen on June 3, 2010, and given to Petitioner to hold, explaining that he planned to extort money from the laptop's owner in exchange for its return. ECF No. 52-15 at 10. Petitioner contended that during an argument over Medina's involving him in this scheme, Medina threatened to hurt him, Angela, and her family. Id.  Petitioner also testified that he called 911 anonymously on June 3, 2010, to report Medina's threats, alleging that Medina planned to kill an entire family. Id. See also ECF No. 52-30 at 251 – 52. The 911 operator directed him to call the Martinsburg City Police, who directed him to call the Berkeley County Sheriff's Department, where he left similar anonymous messages.  ECF No. 52-30 at 251 - 265.
　　Petitioner's testimony that he called 911, Martinsburg City Police, and the Berkeley County Sheriff's Department was supported by his cell phone records and other documentation. ECF No. 52-15 at 10. Medina's trial testimony was that Petitioner had stolen the laptop from Medina's girlfriend [ECF No. 52-31 at 191-98]; but Medina also testified that he sent no one to Angela's house the night of June 5-6, 2010 [ECF No. 52-30 at 77]; that he had no reason to collect any money from Angela [id. at 97]; and he denied having anything to do with her death or her son Andre's death.  Id. at 145.

[10] The WVSCA's opinion summarized the trial testimony, noting that

> At 12:30 a.m. on June 6th, Angela awakened the petitioner, stating there were two guys at the door who would not leave. One of them was named "'Boogy" and the other was unknown, but wore a Baltimore Orioles ball cap. When the petitioner went to the door to confront the men, they said they were looking for Angela, explaining that Angela was a junkie who owed them money. The petitioner convinced the two men to leave but they promised to return.  When the petitioner questioned Angela about this matter, she denied owing money to the men[.]
> 　　The petitioner further testified that sometime later he and Angela went outside to smoke . . . on the porch of the garage apartment.  At that point, Boogy jumped out and charged up the steps toward the petitioner and Angela. Angela ran back into the house. leaving the petitioner to fend off

testimony opened the door to a rigorous cross-examination, wherein the State identified similarities in Petitioner's story to fictional elements contained within a novel Petitioner wrote prior to the killings. See A. Prophet, Enter the Fire: Seven Days in the Life, PublishAmerica[11] (2008).  ECF No. 52-15 at 12-13.

On July 20, 2012, after a 5-day jury trial, Petitioner was convicted on all counts; the jury recommended that he be sentenced to life without the possibility of parole. ECF No. 52-15 at 14; see also ECF No. 52-10.

---

the attackers. The petitioner then tried to run into the house and shut the door, but Boogy crashed into the apartment where he and the petitioner continued to fight[.]

According to the petitioner, the Baltimore Orioles-capped man then appeared, holding a gun. Boogy, with whom the petitioner was fighting, had a knife and cut . . . petitioner's inner forearm . . .[and] pinky finger. After this struggle, . . . petitioner was directed to sit on the couch. He saw Boogy screaming at Angela about money[;] Boogy then attempted to cut Angela's throat with the same knife used to cut the petitioner.  The petitioner attempted to grab the knife at which point the Baltimore Orioles-capped man struck the petitioner with the gun, and Boogy then cut the petitioner's hand with the knife.

The petitioner testified that Boogy took him downstairs for the purpose of breaking into the garage to steal something. After the petitioner arrived back upstairs in the apartment, he saw Angela lying on a mattress with her throat slit and the three-year old Andre lying beside her in a pool of blood. At this point the petitioner sprayed the gun-wielding Baltimore Orioles-capped man with mace and fled . . . As he ran through the woods, shots were fired at him and he heard the voice of a third man whom he thought may have been . . . Medina [. . .] [subsequently,] upon seeing smoke coming from the apartment, [petitioner] ran back into the apartment, grabbed six-week-old Daronte, and placed him on Angela's parents' patio. He banged on the Devonshires' door and when nobody answered, he panicked and fled.. . .[He] admitted that he did not call emergency services and told no one about the events surrounding the victims' deaths and the fire until he testified in court [two years later].  WVSCA opinion, ECF No. 52-15 at 10 - 12.

The WVSCA noted that despite Petitioner's claim that he thought he had heard Medina's voice at the crime scene when he fled into the woods, both Medina and his girlfriend, Anica Small, who had spent the night of June 5 – 6, 2010 with Medina, testified that Medina was elsewhere that night, and that petitioner had texted Medina at around 4:30 a.m. on June 6, 2010, while Medina was asleep, to say that he was "in a situation" and needed help, showing that Petitioner's testimony was not credible.  ECF No. 52-15 at 18 - 19.

Medina also testified that after initially ignoring the 4:30 am text message from Petitioner, he called Petitioner later that day and Petitioner told him he had caught Angela "going through his pockets" and that thereafter, "stuff happened," which could be viewed by a jury as providing a motive for killing her. ECF No. 52-15 at 9, 19.  See also ECF No. 52-30 at 90. Medina testified that Petitioner told him "[Angela] had went in his pocket . . . I assumed like because she used drugs or whatever that she was probably trying to take some money or something from him . . . [so] he [Petitioner] said he did what he had to do" which Medina took as Petitioner's admission to having committed the crimes. ECF No. 52-30 at 95 – 96.

[11] See PublishAmerica, available on line at < http://www.publishamerica.com/ >

At a September 10, 2012 hearing, the circuit court denied Petitioner's post-trial motions for acquittal and a new trial and sentenced him to a determinate term of life without the possibility of parole on each murder conviction, and to a determinate term of twenty (20) years, the maximum sentence[12] on the arson conviction, with all sentences to run consecutively. ECF No. 52-12.

**B. <u>Underlying State Court Record</u>**

Because the claims Petitioner raised in his underlying state court proceedings are so voluminous and repetitive, and have already been set forth in exhaustive detail in the first R&R [ECF No. 68], in the interest in brevity they will not be repeated here.

**C. <u>Petitioner's Federal Habeas Petition</u>**

On August 24, 2016, Petitioner first filed his *pro se* § 2254 petition; it was stricken for its failure to comply with the LR PL P. On September 2, 2016, Petitioner refiled the instant § 2254 petition on a court-approved form.  Per this Court's March 28, 2018 Order, the only § 2254 claims now remaining for consideration are: Grounds 3-9, 10(1)-10(13), 10(15)-10(16), 11, 12(1)-12(3) [sic],[13] and 13 with their subparts. <u>See</u> ECF No. 73 at 2, 30.

**3)** Petitioner's federal constitutional rights to due process of law, to equal protection of the law, and to a fair trial were violated under the United States Constitution's Fifth, Sixth, and Fourteenth Amendments, by the prosecutor's knowing use of false testimony used to obtain the Petitioner's convictions. <u>Id.</u> at 9.

**4)** Petitioner's federal constitutional rights to due process of law, to a fair trial by an impartial jury, to not be compelled to be a witness against himself, to equal protection of the law, to present a defense, to the effective assistance of counsel, and to the access of evidence under the United States Constitution's Fifth, Sixth, and Fourteenth Amendments, when the state impeached the Petitioner's credibility by fundamentally unfair means and by attacking his post-<u>Miranda</u> silence. <u>Id.</u> at 11.

---

[12] At sentencing, the court noted that the maximum sentence was imposed on the arson count because Prophet had "at least two prior felony convictions and an extensive criminal history dating back . . . to at least 1994." ECF No. 52-38 at 42.

[13] As previously noted, this appears to be a typographical error in the Order, given that Ground 12(3) was specifically noted to have been abandoned by Petitioner.  *Cf.* ECF No. 73, n1 at 2, 30 *with* <u>id.</u> at 18, 29.

(a)/(1) During cross-examination, the prosecutor repeatedly questioned Petitioner regarding his post-<u>Miranda</u> silence, and then during closing arguments, argued that the discrepancy between the Petitioner's exculpatory story at trial and his silence at the time of arrest, after <u>Miranda</u> warning were given, gave rise to a legitimate inference that said exculpatory story was fabricated somewhere along the way, perhaps to fit within the seams of the State's case as possibly perceived through discovery evidence;

(b)/(2) during cross-examination and closing argument, the prosecutor repeatedly asserted the Petitioner's due process-mandated entitlement to discovery evidence had undoubtedly aided him in his prosecutor-asserted act of deceiving the jury;

(c)/(3) during cross examination and closing argument, the prosecutor implicitly and illicitly utilized the privileges of the attorney-client relationship to the detriment of the Petitioner; and

(d)/(4) during closing argument, the prosecutor repeatedly accused the Petitioner of having contemporaneously committed the uncharged and unindicated felony crime of perjury throughout the course of his trial testimony.

**5)** Petitioner's federal constitutional rights to due process of law, to a fair trial, and to equal protection of the law were violated under the United States Constitution's Fifth, Sixth, and Fourteenth Amendments when the state rendered Petitioner's trial fundamentally unfair by introducing at trial legally inadmissible and unduly prejudicial evidence to the jury in the form of a fictional novel previously authored by Petitioner. ECF No. 13-1 at 1.

**6)** Petitioner's federal constitutional rights-to due process of law, to a fair trial, to present a complete defense, and to equal protection of the law were violated, under the United States Constitution's Fifth, Sixth, and Fourteenth Amendments, when the trial court refused to give the jury an instruction on the defense's theory of the case. <u>Id.</u>

**7)** Petitioner's federal constitutional rights to due process of law, to not be compelled to be a witness against himself, to the assistance of counsel, to the access of evidence, and to a fair trial were violated, under the United States Constitution's Fifth, Sixth, and Fourteenth Amendments, when the prosecutor for the state engaged in prosecutorial misconduct and made numerous improper remarks before the jury[][<u>id.</u>][including]:

(a)/(1) unlawfully attacking the Petitioner's Constitutional rights to silence, to counsel, and to evidence [<u>id.</u>];

(b)/(2) using her position and status as an agent of the State to undermine Petitioner 's credibility and testimony, and to bolster the testimony of State witnesses [<u>id.</u> at 1 – 2];

(c)/(3) knowingly eliciting and utilizing false testimony to secure the Petitioner's conviction [<u>id.</u> at 2];

11

(d)/(4) presenting under the guise of impeachment knowingly irrelevant, legally inadmissible, and unduly prejudicial evidence in the form of a fictional novel authored by the Petitioner [id.];

(e)/(5) knowingly and deliberately misstating, misrepresenting, and distorting scenes and narratives from the Petitioner's novel for the obvious purpose of unduly prejudicing the Petitioner [id.];

(f)/(6) deliberately misquoting numerous witness' testimony, including the Petitioner's, in order to unduly prejudice the Petitioner [id.];

(g)/(7) repeatedly arguing supposed facts not in evidence [id.];

(h)/(8) inundating the jury with improper remarks during closing arguments [id.]; and

(i)/(9) engaging in other misconduct that unduly prejudiced the Petitioner. Id.

**8)** Petitioner's federal constitutional rights to due process of law, to not be compelled to be a witness against himself, to the assistance of counsel, to the access of evidence, to equal protection of the law, and to a fair trial were violated, under the United States Constitution's Fifth, Sixth, and Fourteenth Amendments, when the trial court engaged in bias and misconduct and made prejudicial remarks before the jury[][id. at 2][by]:

(a)/(1) prior to trial, making an improper, passionate, and extremely prejudicial and biased remark in open court regarding his opinion of the Petitioner's guilt and culpability in the crimes at issue [id.];

(b)/(2) prior to trial, deliberately, improperly, and prejudicially manipulating, or otherwise coercing, a State witness (Joseph Medina) into artificially strengthening the State's case against the Petitioner [id.];

(c)/(3) during jury selection, improperly and prejudicially refusing to strike two biased jurors for cause, one of which ended up on the Petitioner 's impaneled jury [id.];

(d)/(4) during cross-examination, permitting the prosecutor, under the guise of impeachment, to present knowingly irrelevant, legally inadmissible, and unduly prejudicial evidence to the jury in the form of a fictional novel that had been stipulated out [id.];

(e)/(5) during cross-examination, permitting the prosecutor, over defense objection, to attack the Petitioner 's  post-Miranda silence [id.];

(f)/(6) during cross-examination, accusing the Petitioner, in front of the jury, of being "argumentative," inconsistent, and evasive in his answers to the prosecutor [id.];

(g)/(7) not dutifully, under State law, intervening to limit and attempting to correct the prosecutor's improprieties during closing arguments;

(h)/(8) attempting to guide and advise the prosecutor throughout the entirety of the case on how to successfully conduct the prosecution of her case against the Petitioner [id.];

(i)/(9) engaging in other more subtle, though no less prejudicial, conduct to the detriment of the Petitioner. Id.

**9)** Petitioner's federal constitutional rights to due process of law, to equal protection of the laws, to not have cruel and unusual punishment inflicted on him, and to a fair trial were violated, under the United States Constitution's Fifth, Sixth, and Fourteenth Amendments, when he was convicted by evidence insufficient to establish his guilt beyond a reasonable doubt for every element of the charged crime. Id. at 2 – 3.

**10)** Petitioner's federal constitutional rights to due process of law, to present a complete defense, to a fair trial, and to the effective assistance of counsel were violated, under the United States Constitution's Fifth, Sixth, and Fourteenth Amendments, by the ineffective assistance of his state-appointed trial counsel[][id. at 3][when trial counsel]:

(a)/(1) failed to thoroughly and independently investigate the crime at issue [id. at 3];

(b)/(2) failed to file a pretrial motion to suppress the introduction of the Petitioner's violent fictional novel entitled Enter the Fire: Seven Days in the Life [id.];

(c)/(3) failed to request that a limiting instruction be given to the jury informing them that the Petitioner's fictional novel was to be limited to a specific and legitimate purpose to impeach and was not to be used as evidence of a material or substantive fact [id.]; and

(d)/(4) failed to object to, and move for a mistrial for, the prosecutor's improper and unconstitutional post-Miranda silence question of: "Q. And in this instance you've had two years to make up this story?" Id.

(e)/(5) Trial counsel failed to object to, and move for a mistrial for, the prosecutor's improper and unconstitutional post-Miranda silence question: "Q. And you've had

two years to review all of the discovery, all of the pieces, all of the elements — before you came here to testify?" Id.

(f)/(6) Trial counsel failed to object to, and move for a mistrial for, the prosecutor's improper and unconstitutional post-<u>Miranda</u> silence question of: "<u>Q. But you've had two years to review absolutely every detail of this case?</u>" <u>Id.</u> at 3 – 4.

(g)/(7) Trial counsel failed to object to, and move for a mistrial for, the prosecutor's improper and unconstitutional post-<u>Miranda</u> silence remark of: "<u>He studied the records. In every criminal case in West Virginia the State must hand to the defendant everything we know about this case. He has had two years to go through each and every record in this case, each and every phone record, each and every cell record, each and every statement. Everything we have he's had the opportunity to do it . . .</u> " <u>Id.</u> at 4.

(h)/(8) Trial counsel failed to object to, and move for a mistrial for, the prosecutor's improper and unconstitutional post-<u>Miranda</u> silence remark of: "<u>He never tells a living soul his story until he takes that stand</u> . . ." <u>Id.</u>

(i)/(9) Trial counsel failed to object to, and move for a mistrial for, the prosecutor's improper and unconstitutional post-<u>Miranda</u> silence remark of: "<u>Remember that? He's got two years to craft his story</u>  . . ." <u>Id.</u>

(j)/(10) Trial counsel failed to object to, and move for a mistrial for, the prosecutor's improper and unconstitutional post-<u>Miranda</u> silence remark of: "<u>He waits to be on the stand to craft his story. All of his pieces fit. They fit because you can look at every piece of evidence and go oh, this must be what happened. This must be what happened. This may be what happened</u> . . ." <u>Id.</u>

(k)/(11) Trial counsel failed to object to, and move for a mistrial for, the prosecutor's improper and unconstitutional post-<u>Miranda</u> silence remark of: "<u>He's crafted his story. He sat there slick and polished after two years and wrote his story because if he fails in this story he goes to prison for the rest of his life so connect all the little dots</u> . . ." <u>Id.</u>

(l)/(12) Trial counsel failed to object to, and move for a mistrial for, the prosecutor's improper and unconstitutional post-<u>Miranda</u> silence remark of: "<u>It's a story. He wrote a tale and he sat upon the witness stand and he told you that tale after he looked at every sheet of paper that he went over it mile after mile, and he weaved and crafted it into a fine story</u> . . ." <u>Id.</u>

(m)/(13) Trial counsel failed to object to, and to move for a mistrial for, the prosecutor's other improper and unconstitutional remarks made during closing arguments [<u>id.</u>];

(o)/(15) failed to object to, and to move for a mistrial for, the trial court's many instances of blatant bias and misconduct [id.];

(p)/(16) failed to object to a myriad of prejudicial circumstances throughout the entirety of the trial. Id.

**11)** Petitioner's federal constitutional rights to due process of law, and to a fair trial by an impartial jury, were violated, under the United States Constitution's Fifth, Sixth, and Fourteenth Amendments, by the cumulative effect of multiple trial errors[] [ECF No. 13-1 at 5] [including]:

(a)/(1) EACH AND EVERY INDIVIDUAL AND COLLECTIVE ASSERTION AND ARGUMENT OF ERROR MADE IN GROUNDS 1 - 10 OF THIS PETITION ABOVE [id.] (emphasis in the original);

(b)/(2) the prosecutor for the State failing to provide pre-trial notice of its intent to use 404(b) evidence against the Petitioner [id.];

(c)/(3) the trial court failing to change the venue of the trial due to massive pre-trial publicity adverse to the Petitioner [id.]; and

(d)/(4) State witness Lt. Harmison deliberately and unnecessarily informing the jury during his testimony that the Petitioner was being held in the local regional jail. Id.

**12)** Petitioner's federal constitutional rights to due process of law, and to the effective assistance of counsel were violated, under the United States Constitution's Fifth, Sixth, and Fourteenth Amendments, by the ineffective assistance of his state-appointed appellate counsel[] [id.][who failed to]:

(a)/(1) present certain grounds on appeal that were obviously stronger than those presented [id.];

(b)/(2) present federal constitutional questions or cite to United States Supreme Court authority [id.];

**13)** Petitioner's federal constitutional rights to due process of law, and to the equal protection of the law were violated, under the United States Constitution's Fifth and Fourteenth Amendments, when the WVSCA violated its state constitution so as to deny the Petitioner a state-created liberty interest, and when it failed to provide the Petitioner meaningful appellate and post-conviction collateral review. ECF No. 13-1 at 6.

Regarding exhaustion, Prophet asserts that "[a]ll the grounds presented in this petition have been presented to West Virginia's highest court [id. at 15];" that he fully exhausted his state court remedies as to Grounds 5 – 13; Grounds 5, 6, 7, 8, and 9 were raised on direct appeal; Ground 10 was not raised on direct appeal because IAC claims are more properly raised in post-conviction

collateral review; Ground 11 was not raised on direct appeal due to appellate counsel's ineffectiveness; and that Grounds 12 and 13 "were not raised on direct appeal for obvious reasons." Id. at 6 - 7. He contends that he appealed all of the claims denied in his state habeas motion to the WVSCA. Id. at 7.

Petitioner contends that his petition is timely filed. Id. at 17.

As relief, Petitioner requests that his convictions be reversed and/or overturned, and that he be immediately discharged from state custody. Id. at 18.

### E. Respondent's Motion for Summary Judgment

Respondent contends that the petition should be dismissed and summary judgment granted in its favor because it is apparent from the record that the WVSCA recognized and applied Strickland,[14] the relevant legal standard, in finding that Petitioner's constitutional right to effective trial and appellate counsel were not violated.

Further, Respondent asserts that the Petitioner's claims of prosecutorial and judicial misconduct are either frivolous, lack merit, have no support in the record, improperly request that this Court review reasonable state-court evidentiary rulings, request rulings based on incorrect statements of law, are conclusory or speculative allegations without factual support, misunderstand the role of a prosecutor's permissible advocacy, and fail to show that the WVSCA's decisions regarding them were unreasonable application of federal law or unreasonable determination of facts.

Respondent contends that the WVSCA noted that Plaintiff's sufficiency of the evidence claim should be limited to whether there was proof of premeditation and deliberation, given that

---

[14] Strickland v. Washington, 466 U.S. 668 (1984).

during the defense's argument for judgment of acquittal, Petitioner conceded that the evidence was sufficient to find second degree murder [see ECF No. 52-15 at 15]; the WVSCA made a specific finding that the testimonial and inferential evidence was sufficient to find that Petitioner premeditated the murders and arson. Because the WVSCAs findings were reasonable, and were neither contrary to, nor based on an unreasonable application of clearly established federal law, the claim fails.

Finally, Respondent contends that Petitioner's claim of cumulative error is a legal impossibility, given that Petitioner suffered no unconstitutional error during trial.

Accordingly, Respondent concludes that Petitioner has failed to state a claim upon which relief can be granted.

### F. **Petitioner's Responses in Opposition**

In his 54-page typewritten response in opposition, Prophet reiterates his arguments and attempts to refute the state's on the same.  He continues to argue that his conviction and sentences violate the constitution, and that he has been prejudiced by the actions of the state courts. He requests that the Court deny the Respondent's dispositive motion. ECF No. 90 at 2 – 50.

## II.  **Standard of Review**

### A. **Summary Judgment**

The Supreme Court has recognized the appropriateness of Rule 56 summary judgment motions in habeas cases. See Blackledge v. Allison, 431 U.S. 63, 80 (1977). So too has the Fourth Circuit Court of Appeals. Maynard v. Dixon, 943 F.2d 407 (4th Cir. 1991). Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Motions for summary judgment impose a difficult standard on the moving party; for it must be obvious that no rational trier of fact could find for the nonmoving party. Miller v. Federal Deposit Ins. Corp., 906 F.2d 972, 974 (4th Cir. 1990). However, the "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Anderson v Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." Id. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir 1987). Such evidence must consist of facts which are material, meaning that the facts might affect the outcome of the suit under applicable law, as well as genuine, meaning that they create fair doubt rather then encourage mere speculation. Anderson, 477 U.S. at 248. It is well recognized that any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587-588 (1986).

## B. Federal Habeas Review Under 28 U.S.C. § 2254

Notwithstanding the standards which govern the granting of a motion for summary judgment, the provisions of 28 U.S.C. § 2254 must be examined to determine whether habeas relief is proper. Title 28 U.S.C. § 2254 requires a district court to entertain a petition for habeas corpus relief from a prisoner in State custody, but "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "Federal habeas relief does not lie for errors of state law." Thomas v. Taylor, 170 F.3d 466, 470 (4th Cir. 1999);

see also Weeks v. Angelone, 176 F.3d 249, 262 (4th Cir. 1999). Regardless, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State Court shall not be granted unless it appears that...the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A).

The "exhaustion" doctrine requires a federal habeas Petitioner to have presented all federal claims - *in federal terms* - to the highest state court prior to presenting them for federal habeas review. Picard v. Connor, 404 U.S. 270, 275 (1971) (citations omitted). This requirement ensures the State is given the "opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Id. To exhaust a claim in state court, Petitioner must "expressly raise[] that same federal constitutional claim in state court that he raises in federal court." Diaz v. Weisner, 2006 U.S. Dist. LEXIS 56583, at *31 (W.D.N.C. Aug. 1, 2006). "It is not enough that all the facts necessary to support the federal claim were before the state court or that a somewhat similar state-claim was made." Anderson v. Harless, 459 U.S. 4, 6 (1982) (citations omitted).

Even if a Petitioner is found to have exhausted his state remedies, the federal court may not grant habeas relief for claims adjudicated on their merits by the state court unless the state court's adjudication:

1. resulted in a decision that was contrary to, or involved in an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or
2. resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C. § 2254(d)(1) and (2); see also Williams v. Taylor, 529 U.S. 362 (2000).

The Fourth Circuit Court of Appeals has determined that "the phrase 'adjudication on the merits' in section 2254(d) excludes only claims that were not raised in state court, and not claims that were decided in state court, albeit in a summary fashion." Thomas v. Taylor, 170 F.3d 466,

475 (4th Cir. 1999). When a state court summarily rejects a claim and does not set forth its reasoning, the federal court independently reviews the record and clearly established Supreme Court law. Bell v. Jarvis, 236 F.3d 149 (4th Cir.), *cert. denied*, 524 U.S. 830 (2001) (quoting Bacon v. Lee, 225 F.3d 470, 478 (4th Cir. 2000)). However, the court must still "confine [its] review to whether the court's determination 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" Id. at 158.

A federal habeas court may grant relief under the "contrary to" clause if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A federal court may grant a habeas writ under the "unreasonable application" clause, "if the state court identifies the correct governing legal principle from the Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. "An unreasonable application of federal law is different from an incorrect application of federal law." Id. at 410.

When a Petitioner challenges the factual determination made by a state court, "federal habeas relief is available only if the state court's decision to deny post-conviction relief was 'based on an unreasonable determination of the facts.'" 28 U.S.C. § 2254(d)(2). In reviewing a state court's ruling on post-conviction relief, we are mindful that 'a determination on a factual issue made by a State court shall be presumed correct,' and the burden is on Petitioner to rebut this presumption 'by clear and convincing evidence.'" Tucker v. Ozmint, 350 F.3d 433, 439 (4th Cir. 2003).

Habeas corpus relief is not warranted unless the constitutional trial error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Richmond v. Polk, 375 F.3d 309 (4th Cir. 2004). "Under this standard, habeas Petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" Brecht, 507 U.S. at 637.

## C. **Liberal Construction of *Pro Se* Filers' Pleadings**

Although *pro se* petitions are to be liberally construed as set forth in Haines v. Kerner, 404 U.S. 519 (1972), habeas petitions must meet heightened pleading requirements. McFarland v. Scott, 512 U.S. 849 (1994). "[N]otice pleading is not sufficient, for the petition is expected to state facts that point to a real possibility of constitutional error." Blackledge v. Allison, 431 U.S. 63, 75, n. 7 (1977) (internal quotations omitted). A habeas petitioner must come forth with evidence that a claim has merit. Nickerson v. Lee, 971 F. 2d 1125, 1136 (4th Cir. 1992), *cert. denied*, 507 U.S. 923 (1993). Unsupported, conclusory allegations do not entitle a habeas petitioner to relief. Id. "Principles requiring generous construction of *pro se* complaints are not, however, without limits. Gordon[15] directs district courts to construe *pro se* complaints liberally. It does not require those courts to conjure up questions never squarely presented to them. District judges are not mind readers." Beaudett v. City of Hampton, 775 F.2d 1274, 1278, 1985 U.S. App. LEXIS 24559, *7-8 (4th Cir. 1985). Moreover, mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. Eason v. Thaler, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and

---

[15] Gordon v. Leeke, 574 F.2d 1147 (4th Cir. 1978).

unsupported speculation are not competent summary judgment evidence. See Forsyth v. Barr, 19

F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994).

### III. Analysis

The undersigned prefaces this analysis to note that despite having been significantly

reduced by the claims already waived and those found to be procedurally barred after filing,

including all sub-grounds, Petitioner's grounds for relief still includes raising 48 claims. The

claims are repetitive; nearly all are first raised as prosecutorial misconduct, then as judicial

bias/misconduct, and then as ineffectiveness of counsel. Petitioner then challenges the sufficiency

of the evidence, and finally, raises a claim of cumulative error.  For clarity and ease of disposition,

the claims have been addressed numerically where possible, but also grouped by type.

### A. Prosecutorial Misconduct:

**Ground 3**: Whether Petitioner's federal constitutional rights under the Fifth, Sixth, and Fourteenth
Amendments were violated when the prosecutor's knowing use of false testimony was used to
obtain the Petitioner's convictions. (Joseph Medina testimony).

As his sole factual basis for this claim, Petitioner argues that the prosecutor permitted the

witness Medina to testify and imply falsely that he had not spoken adversely about Petitioner to

the authorities regarding the crimes at issue during his first interview, because he had not had an

attorney present. See ECF No. 13 at 10.

A criminal defendant is denied due process of law when false testimony is used against

him at trial. Nupue v. Illinois, 360 U.S. 264, 269 (1959). To state a successful habeas claim under

Napue, a criminal defendant must prove that "the prosecution knew, or should have known of the

perjury." United States v. Agurs, 427 U.S. 97, 103. (1976).

A review of the record indicates that the WVSCA relied on the holding of State ex rel. Franklin v. McBride,[16] when it reviewed this claim, providing an independent and adequate state law basis for the state courts' denial of habeas relief to Petitioner. See Coleman v. Thompson, 501 U.S. 722 (1991). The WVSCA found that not only did Petitioner fail to show that the prosecutor presented false testimony, he also failed to make the requisite showing that Medina's trial testimony was false. See ECF No. 52-15 at 27.

As noted *supra*, at trial, while Medina admitted not initially revealing everything he knew about the crime during his first statement to the police, because he had charges pending against him and did not yet have counsel, he also testified that he sent no one to Angela's house the night of June 5-6, 2010 [ECF No. 52-30 at 77]; had no reason to collect any money from Angela [id. at 97]; and denied having anything to do with her or her son Andre's death.  Id. at 145.

Accordingly, while the WVSCA acknowledged that Medina's trial testimony was sometimes inconsistent with that of his prior statements to the police, it found that such testimony did not amount to a false statement at trial. ECF No. 52-15 at 27.  Petitioner has not proven that there was any perjury, let alone that "the prosecution knew, or should have known of the perjury[.]" See United States v. Agurs, 427 U.S. at 103. Because the WVSCA's determination of the factual underpinnings of Ground Three was not unreasonable, Petitioner's Ground Three claim was decided on an independent and adequate state law basis, and he is not entitled to relief.

**Ground 4**: Whether Petitioner's federal constitutional rights under the Fifth, Sixth, and Fourteenth Amendments were violated when the state impeached the Petitioner's credibility by fundamentally unfair means and by attacking his post-Miranda silence.

---

[16] State ex rel. Franklin v. McBride, 226 W. Va. 375, 701 S.E.2d 97 (2009) ("[i]n order to obtain a new trial on a claim that the prosecutor presented false testimony at trial, a defendant must demonstrate that (1) the prosecutor presented false testimony, (2) the prosecutor knew or should have known the testimony was false, and (3) the false testimony had a material effect on the jury verdict"), which is an independent and adequate state law basis for the state courts' denial of habeas relief to Petitioner.

Petitioner contends that during cross examination, (a)/(1) the state repeatedly questioned him about his post-<u>Miranda</u> silence, and during closing arguments, argued that the discrepancy between the Petitioner's exculpatory story at trial and his post-<u>Miranda</u> silence after arrest, eleven days after the murders/arson occurred, gave rise to a legitimate inference that his exculpatory story was fabricated. Petitioner also argues that (b)(1) at cross examination and in closing, the state repeatedly asserted that Petitioner's entitlement to discovery evidence had undoubtedly aided him in deceiving the jury, and that (c)/(3) during cross-examination and closing, the state "implicitly and illicitly utilized the privileges of the attorney-client relationship to the detriment of the Petitioner." ECF No. 13 at 12.  Petitioner contends that counsel only objected to the first two post-<u>Miranda</u>-silence prosecutorial cross-exam remarks, but once they were overruled, the prosecutor continued her allegedly improper line of questioning and argument. Finally, Petitioner contends that (d)/(4) during closing argument, the state repeatedly accused him of having perjured himself throughout the course of his trial testimony. <u>See</u> *generally* ECF No. 13 at 11 – 13.

The state denies Petitioner was impeached on his post-arrest silence.  ECF No. 82 at 6.

The United States Supreme Court has held that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether prosecutor's conduct affected the fairness of the trial."  <u>United States v. Young</u>, 470 U.S. 1, 11 (1985).  In fact, courts have applied what has come to be known as the "invited response" or "invited reply" rule, whereby courts look at the remarks within the context of the entire trial to determine whether the prosecutor's behavior amounted to prejudicial error.  <u>Id.</u> at 12.

"Prosecutorial misconduct may warrant habeas relief only if the relevant misstatements were so egregious as to render the entire trial fundamentally unfair to a degree tantamount to a due

process deprivation." Caldwell v. Russell, 181 F.3d 731, 736 (6th Cir. 1999)(citations omitted), *abrogated on other grounds*, Mackey v. Dutton, 217 F.3d 399, 406 (6th Cir. 2000); see also Darden v. Wainwright, 477 U.S. 168, 181 (1986)("The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process'") (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)).

At trial, Petitioner testified that after he left the baby on Angela's parents' patio in the early morning hours of June 6, 2010 and fled, because he "felt terrible for [the family] for fleeing the scene without telling them anything," at 7:53 pm the next day, he sent a text message to Angela's father, Sidney Devonshire, stating "[m]y condolences to your family. I'm truly sorry for your loss. I tried to stop it. I tried to – I tried to protect Angie and the baby from them. I wasn't able to. I'm sorry." See ECF No. 52-30 at 321 – 325.

In his petition, Petitioner challenges the prosecutor's allegedly improper statement during cross examination: "[a]nd you told us today that you wrote this work of fiction and you've told us this story that you've told us about what happened on the night of the events and that particular story was never told to anyone of law enforcement - " see ECF No. 13 at 12; see also ECF No. 52-31 at 33. However, a careful review of the trial court record reveals that Petitioner did not include the prosecutor's entire statement, nor the dialogue that followed:

> Q.  And you told us today that you wrote this work of fiction and you've told us this story that you've told us about what happened on the night of the events and that particular story was never told to anyone of law enforcement –
>
> MR. MANFORD: Objection.
>
> Q. -- or otherwise.
>
> THE COURT: Hold on. There's an objection.
>
> MR. MANFORD:  I may be totally wrong but -- can we have a short sidebar?

THE COURT: Sure.

(Conference at the bench between the Court and Counsel with the Defendant present as follows:)

MR. MAN FORD: I could be totally wrong but isn't that commenting on prior statements? She's trying to say you didn't tell anybody about that. That's his right until he comes to court.

THE COURT: He can say why he didn't do it, but I think she's entitled to say this is the first time it has come up, yeah.

MR. MANFORD: So I'm not arguing again, but I had this in another case in Morgan County where the prosecutor made a reference to the Defendant never . . .

THE COURT: Exercising his right to silence to the police officer. She can't say you never told it to the police or anything like that. Did you ever tell it to anyone. You can't say when the police got you[,] you didn't tell them that, did you. This is one of those cases where there could be an exception because he did make contact after the event to Mr. Devonshire[,] and she could say why didn't you tell him[,] but you can't - - pre-arrest silence is not the same as post-arrest. It's statements to law enforcement that is exercising your right to silence so you can't ask him about anything about law enforcement.

MR. MANFORD: Okay.

THE COURT: But you can say he contacted Mr. Devonshire after and you didn't tell him things like that[,] because that's not exercising your right to silence.

MR. MANFORD: I agree.

THE COURT: Pre-arrest. Pre-arrest silence is allowed in. Post-arrest silence isn't.

MR. PREZIOSO: After he was arrested

MR. PREZIOSO: After he was arrested he did – [Lieutenant] Harmison did try to interview him and he asserted his Fifth Amendment right.

THE COURT: All of that stays out. It has to be pre-arrest.

MR. MANFORD: That was two years ago, right. Your Honor, just so we have a time, pre-arrest silence was two years ago.

THE COURT: Unless he made a statement to someone -- I mean, if it's -- if it's non-law enforcement he made a statement.

26

MR. MANFORD:  Some snitch in the jail, sure.

THE COURT:  Or something like that, but pre-arrest silence does not -- the Fifth Amendment has not attached –

MR. MANFORD: I agree.

THE COURT:  So pre-arrest silence.

MR. MANFORD:  You're at your own peril if you talk to someone.

THE COURT: Right. Or someone non-law enforcement outside.

ECF No. 52-31 at 34 – 21 35. After the court informed the state that it would permit cross-exam regarding Petitioner's pre-arrest silence, but questions regarding his post-arrest silence were prohibited, the prosecutor asked Petitioner why, when he sent the text message to Angela's father that day, he never told Angela's father the version of events he was now alleging for the first time at trial, leading to the next allegedly improper statement Petitioner contends that the prosecutor made: "[y]ou did not tell anyone the story you told us yesterday prior to taking the stand; is that correct?" ECF No. 13 at 12. The trial transcript reflects the following exchange was had:

Q. You did not tell anyone the story that you told us yesterday prior to taking the stand; is that correct?

A. That's incorrect.

MR. MANFORD:  Objection.  Move to strike based on the ruling.  Unless I totally misunderstood what the Court –

THE COURT:  Well, no.  What I said – I'm going to allow that and leave it at that. I will overrule the objection based on that.

MS. GAMES-NEELY: (resumed)

Q.  Did you, in fact, contact Sidney Devonshire -- and I will put this back up on the overhead. The jury has already seen this. I'm going to show you Defendant's Exhibit Number Nine, sir, and ask if you recognize that text message.

THE COURT: It's already in. He's already identified it.

A. Yes, ma'am.

Q. That is the text message that you sent to Sidney Devonshire; is that right?

A. That is correct.

Q. And that text message has what date on it?

A. June 7th, 2010, 7:53 p.m.

Q. And on that particular text message, sir, do you describe to him what you've described on that witness stand?

A. No, ma'am.

Q. Did you call Sidney Devonshire and tell Sidney Devonshire what information you had regarding the murder of his daughter and his grandson?

A. No, ma'am.

ECF No. 52-31 at 36 - 37. On appeal, the WVSCA, while recognizing that the state's questions about Petitioner's pre-arrest silence "potentially could have been construed as referring to the petitioner's post-arrest silence," reasoned that the state's "question was ambiguous and isolated, and the prosecutor did not pursue this question improperly into the realm of post-arrest silence [ECF No. 52-15 at 23-24]" before concluding that Petitioner was not subjected to impermissible questioning on his post-arrest silence, in violation of his Miranda rights. Id. at 24

The next allegedly improper prosecutorial cross examination remarks Petitioner challenges, contending they impliedly accused him of perjury and of using his entitlement to discovery to fabricate a story were: "in this instance, you've had two years to make up this story?" [see ECF No. 13 at 12]; "you've had two years to review all of the discovery, all of the pieces, all of the elements - before you came here to testify? [id.]" and "[b]ut you've had two years to review absolutely every detail of this case?" Id. Again, the full context of those statements is as follows:

Q.  And in this instance, you've had two years to make up this story.

A.  I didn't make up any story, ma'am.

Q.  And you've had two years to review all the discovery, all of the pieces, all of the elements - -

A.  I didn't - -

Q.  -- before you came here to testify?

A.  I didn't make up any story, ma'am.

Q.  But you've had two years to review absolutely every detail of this case.

A.  If you want to look at it like that, yes, ma'am.

ECF No. 52-31 at 157. Petitioner's next contention is that the prosecutor made improper and prejudicial remarks in closing argument, when she said:

> He studied the records. In every criminal case in West Virginia the State must hand to the defendant everything we know about this case. He has had two years to go through each and every record in this case, each and every phone record, each and every cell record, each and every statement. Everything we have he's had the opportunity to do it.

ECF No. 13 at 13. However, the full text of this dialogue is as follows:

> He studied the records. In every criminal case in West Virginia the State must hand to the defendant everything we know about this case. He has had two years to go through each and every record in this case, each and every phone record, each and every cell record, each and every statement. Everything we have he's had the opportunity to do it. As any author will tell you, they study their craft, how does A fit into B, and how can I best convince somebody else to do this. Let's face it, he's facing a life sentence. If he doesn't sell the book, if he doesn't sell his story, ladies and gentlemen, he's facing a life sentence. He has a reason to create and craft the story. And that's what it is. It is a story.

ECF No. 52-32 at 41.

Next, Petitioner's Ground 4(b)/(2) claim challenges the propriety of the prosecutor's continued closing argument remarks to the effect that "[h]e never tells a living soul his story until he takes that stand [ECF No. 13 at 13]" and "[r]emember that? He's got two years to craft this

story." Id.; see also ECF No. 52-32 at 54, 55.  Further, Petitioner objects to the prosecutor's statement that "[h]e waits to be on the stand to craft this story. All of his pieces fit. They fit because you can look at every piece of evidence and go oh, this must be what happened. This must be what happened. This may be what happened [ECF No. 13 at 13]" and "[h]e's crafted his story. He sat there slick[ed] and polished after two years and wrote his story because if he fails in this story he goes to prison for the rest of his life so connect all the little dots."  ECF No. 13 at 13. These statements, in full context, stated:

> He waits to be on the stand to craft this story. All of his pieces fit. They fit because you can look at every piece of evidence and go oh, this must be what happened. This must be what happened. This may be what happened. Who can verify a word of what he says? Who can verify it? Angela Devonshire and Andre White, and they're dead. They can't tell.

ECF No. 52-32 at 64 – 65.  The next statement, read in full, states:

> I don't know what happened inside that house, but I can tell you this, there's a struggle between Angela and I believe that struggle was with Mr. Prophet. . . we've made this case a great deal about what Angela did and didn't do and Angela's life . . . but there's another victim here.  Little Andre had nothing to do with any of this. Little Andre . . . knew or saw what happened to his mommy . . . everybody knew that Mr. Prophet was there, but little Andre could talk. Little Daronte couldn't and that's why he was spared.  It would be very easy for a three year old to say he hurt my mommy and point. We never got that opportunity with him. Little Daronte . . . survives with blood on him.  Does that blood make a lot of sense whether it's superficial or otherwise? Sure. He's [Prophet] cut.  But it's just as easy to say he was cut in a struggle with Angela than he was cut with anyone else. The only person that took that stand and said she [Angela] had a drug debt is him. Him. He's crafted his story. He sat there slicked and polished after two years and wrote his story because if he fails in this for the rest of his life so story he goes to prison for the rest of his life[,] so connect all the little dots. Ladies and gentlemen, it's not Joseph Medina. He put a bounty on Joseph Medina. He called in about Joseph Medina. He set up Joseph Medina. What's the perfect fall guy for a murder that you do? Let's blame Joseph Medina.

ECF No. 52-32 at 106 - 07.  Petitioner also objected to the prosecutor's statement saying "[i]t's a story. He wrote a tale and he sat upon the witness stand and he told you that tale after he looked at

every sheet of paper that he went over it mile after mile, and he weaved and crafted it into a fine

story." ECF No. 13 at 13.  In full context, that statement read:

> It's a story. He wrote a tale and he sat upon the witness stand and he told you that
> tale after he looked at every sheet of paper[,] that he went over it[,] mile after mile
> after mile, and he weaved and crafted it into a fine story.  On direct[,] great story.
> On cross-examination he had issues.

ECF No. 52-32 at 108.

The petition does not explain what Petitioner is referring to in his Ground 4(c)/(3) claim

that during cross-examination and closing, the state "implicitly and illicitly utilized the privileges

of the attorney-client relationship to the detriment of the Petitioner."  ECF No. 13 at 12. However,

in his response in opposition to the Respondent's summary judgment motion, it is presumed that

this claim is explained by Petitioner's oblique reference to having told his version of the story to

counsel "immediately after his arrest," but that on the advice of counsel, not having shared that

version of the events with the prosecutor "because his version . . . was self-incriminating in certain

ways" because it placed him at the scene of the crime while it was committed.  ECF No. 90 at 11

– 12. Petitioner argues that "not once was the jury ever instructed that it is the Constitutional right

of every American citizen to remain silent after arrest, and that no inference of guilt can . . . be

drawn . . . for exercising said right." Id. at 12.

Petitioner's argument overlooks the fact that at the close of the state's case, outside of the

jury's presence, the court advised Petitioner of his right to testify, explaining that

> [i]f you do testify then then you're subject to cross-examination. If you don't testify
> then, of course, you're not subject to cross-examination. If you testify I instruct the
> jury that you're a competent witness on your own behalf and that they are to weigh
> your testimony under the same standards and the same way they weigh any other
> witness's [sic] testimony. If you choose not to testify then I instruct the jury that
> they are to disregard the fact that you did not testify in their deliberations on the
> issue of guilt or innocence.

ECF No. 52-30 at 221 – 22. Further, the instructions to the jury included a charge that it was the state's burden to prove his guilt beyond a reasonable doubt and that a defendant was not required to prove himself innocent, because he was presumed to be so under the law. ECF No. 52-28 at 8, 183; ECF No. 52-9 at 3.

Nonetheless, it is clear from even a cursory review of the relevant portions of the trial transcript that the prosecutor was not attempting "implicitly and illicitly" attack Petitioner's rights to a confidential attorney-client relationship to his detriment; it is apparent from the context of the prosecutor's statements to the effect that Petitioner had never told anyone his version of the events before, that the prosecutor did not intend to include a query as to whether Petitioner had ever told his story to defense counsel, but was specifically questioning whether Petitioner had told his version of the events to Angela's father in the above-referenced June 7, 2010 text message.   There is simply no merit to this claim.  "It is plain beyond a shadow of a doubt that the petitioner is grasping at straws." United States ex rel. Sullivan v. Pennsylvania, 244 F. Supp. 883, 885, (E.D. Pa. 1965).

After a careful review of the trial record, the undersigned agrees with the WVSCA that the Petitioner was not impeached on his post-arrest silence. Utilizing its previous holding in Syl. Pt. 1, State v. Boyd, 160 W. Va. 234, 233 S.E.2d 710 (1977), the WVSCA recognized that impeachment through utilization of post-Miranda silence was reversible error [ECF No. 52-15 at 22] but noted that the trial court had carefully distinguished pre-arrest from post-arrest silence. Id. It concluded that "impeachment by use of pre[-]arrest silence does not violate the Fourteenth Amendment." Id. (citing Jenkins v. Anderson, 447 U.S. 231, 240 (1980)).

As for Petitioner's Ground 4(d)/(4) claims that the prosecution engaged in misconduct by making the  other pejorative statements referred to above, implying Petitioner was a liar and

32

commenting on how long Petitioner had had to craft a story that he never told anyone prior to trial, this was proper cross-examination, and Petitioner had ample opportunity to rebut this evidence. Further, to be unconstitutional, the remarks made by the prosecution, taken in light of the totality of the circumstances, must make the entire trial unfair.  Darden v. Wainwright, 477 U.S. 168, 181 (1986).  The undersigned finds that the prosecutor's argument was "well within the permissible bounds of advocacy" to challenge and comment on Petitioner's credibility.  United States v. Lopez, 584 F.2d 1175, 1178 (2nd Cir 1978). By choosing to testify, Petitioner brought his credibility into issue. The jury was instructed by the court that the comments and argument of counsel were not evidence, and that they were to decide the case solely on the evidence presented. ECF No. 52-28 at 180 – 81; ECF 52-32 at 24-25, 32.

As for the statements made during closing argument, again, there was nothing improper about the prosecutor's commenting on Petitioner's credibility; her remarks were based upon evidence presented; and as noted *supra*, the jury had already been instructed that counsels' argument was not evidence. Accordingly, the undersigned finds that Petitioner has not demonstrated that the prosecutor's comments implying that Petitioner was a liar who had had two years to concoct a story were so fundamentally unfair as to deny him due process.

With regards to these Ground 4 claims, Petitioner has not articulated any unreasonable application of federal law which occurred in the state proceedings, nor does he allege that the state court's adjudication resulted in a decision based on an unreasonable determination of the facts. Therefore, because the decisions of the state courts were not contrary to, nor did they involve an unreasonable application of, clearly established federal law as determined by the Supreme Court, the Petitioner has not established that he is entitled to relief pursuant to 28 U.S.C. § 2254(d)(1).

**Ground 5**: Whether Petitioner's federal constitutional rights under the Fifth, Sixth, and Fourteenth Amendments were violated when the state rendered the Petitioner's trial fundamentally unfair by

33

introducing legally inadmissible and unduly prejudicial evidence to the jury in the form of a fictional novel previously authored by Petitioner.

Relief under 28 U.S.C. § 2254 is available to state prisoners in "custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254 (2002). Violations of state law and procedure that do not implicate specific federal constitutional provisions are not cognizable in *habeas* review. See Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991)("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); Fisher v. Angelone, 163 F.3d 835, 854 (4th Cir. 1998), *cert. denied*, 526 U.S. 1035, 119 S.Ct. 1290, 143 L.Ed.2d 382 (1999).

Generally, federal *habeas* relief is available with respect to a trial court's evidentiary rulings, only if the ruling denied the defendant the right to a fair trial. See Abrams v. Barnett, 121 F.3d 1036, 1042 (7th Cir. 1997). When the challenged evidentiary rulings "so infected the entire trial that the resulting conviction violates due process," it is presumed that the defendant was denied a fair trial. Cupp v. Naughten, 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). The fact that the admitted evidence allegedly was improper under state law however, does not provide a basis for *habeas* relief. "[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." Marshall v. Lonberger, 459 U.S. 422, 438, n. 6, 103 S.Ct. 843, 853, n. 6, 74 L.Ed.2d 646 (1983). The proper inquiry for the Court is whether the admission of the evidence itself so infected the entire trial that the resulting conviction violates due process. See Estelle, 502 U.S. at 72, 112 S.Ct. at 482.

In this case, before trial, the parties stipulated that the state could not use Petitioner's novel in the state's opening statement or its case-in-chief, but that the state would be free, subject to the

rules of evidence, to refer to the novel in any rebuttal it might present. ECF No. 52-15 at 12 – 13.

Accordingly, during Petitioner's cross-exam, the state sought to introduce evidence in the form of

the novel Petitioner had written approximately two years before the crimes. See ECF No. 52-31 at

16 – 26. Defense counsel objected on the basis of the stipulation and relevancy. In a sidebar, before

the issue was decided, the court elicited from the prosecutor what she wanted to use the book for

and the prosecutor replied that

> [t]his book is . . . the story of a drug war going on with an individual . . . who is
> trying to get out of the drug trade . . . there was a fire [in] which an individual was
> killed, burned, so there was not criminal evidence remaining. It talks about knives
> being used to slice individuals' throats, . . . an individual who executed this family
> specifically his wife and the daughter . . . [t]he young daughter does survive for a
> period of time but the wife was executed as well.

ECF No. 52-31 at 19 – 20. The court noted that "[t]he State's theory is this is all made up, his

whole story is made up.  If they can show he's previously written a book that involves drugs and

somebody being killed and things like that I think they're entitled to explore that." Id. at 20. The

court further noted that

> [l]et me say this. You all got in his statements - - - I allowed you to get his statement
> in to 911 which is a perfect act of fiction because it says Joseph Medina is going to
> kill a family tonight and nobody was killed that night.  So it's a prior so you have
> to let that in . . .  I think that it's very probative and on the matter and the jury should
> be allowed to hear it because they are the ones that have to go back there and judge
> credibility of the witnesses on the testimony.

Id. at 24 - 25. Accordingly, the prosecutor proceeded in a line of questioning to elicit admissions

from Petitioner that there were similarities in the plot of the book to the facts of the case,

specifically, that a fire could destroy evidence of crimes, that violence was inherent in drug culture,

and that "[p]eople get their throats slit." Id. at 26 – 30.  Although Petitioner initially attempted to

deny recalling anyone in his book getting their throat slit, after the prosecutor reminded him that

the character "Baby Jah" got "his throat cut and his head dismembered," Petitioner conceded to

the fact. Id. at 30. Further, the prosecutor got Petitioner to admit that in the book, "the wife of your major character dies because of a home invasion." Id. at 30 – 31.

On appeal, the WVSCA found that "the prosecutor used the fact that the petitioner was a creative writer to imply that he used his creative skills to fabricate his trial testimony and that he borrowed several elements from his novel in fabricating his trial testimony."[17] ECF No. 52-15 at 21. Finding that the admission of such evidence was proper on cross-examination under Rule 611(b)(1) of the West Virginia Rules of Evidence[18] and State v. Bradshaw, 193 W. Va. 619, 457 S.E.2d 456 (1995), the WVSCA concluded that Petitioner's claim was legally unsupported. Moreover, the WVSCA further found that the state's use of the novel to attack Petitioner's credibility outweighed any perceived danger of unfair prejudice. Finally, the WVSCA also determined that the state's use of the novel as evidence during its cross-examination of Petitioner was not improper under Rules 404 and 608(b) of the West Virginia Rules of Evidence.

---

[17] Specifically, the WVSCA noted that

> [d]uring her cross-examination of the petitioner, the prosecutor was able to establish that the petitioner's novel contains themes of violence within the drug culture, the novel refers to a house fire; two main characters in the novel were drug dealers, the wife of one of the main characters is killed and his young child is seriously injured in a home invasion, and a character in the novel has his throat slit[.] The prosecutor, in her closing argument, characterized the petitioner as a writer of crime fiction who had two years to parse every piece of the State's evidence in his case and to fabricate a story consistent with the State's evidence[.] The prosecutor also emphasized  the similarities between the petitioner's novel and his trial testimony.

ECF No. 52-15 at 13.

[18]  W.Va. Rule of Evidence 611(b)(1) states that a party witness ". . . may be cross-examined on any matter relevant to any issue in the case, including credibility. In the interest of justice, the judge may limit cross-examination with respect to matters not testified to on direct examination."

Here, while Petitioner contends that this evidentiary ruling was improper and resulted in a constitutional violation, the undersigned finds that Petitioner has not demonstrated that the trial court's admission of the state's evidence in accordance with the parties' stipulation was improper or denied him a fundamentally fair trial.  A federal collateral review court does "not sit to review the admissibility of evidence under state law unless erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceedings." Barbe v. McBride, 521 F.3d 443, 452 (4th Cir. 2008) (citing Burket v. Angelone, 208 F.3d 172, 186 (4th Cir. 2000)). As such, "[i]t is only in circumstances impugning fundamental fairness or infringing specific constitutional protections that a federal question is presented." Id. (citing Spencer v. Murray, 5 F.3d 758, 762 (4th Cir. 1993)).

Here, the circuit court's evidentiary rulings were correct. Beyond conclusory statements that the line of questioning was erroneous and prejudicial, Petitioner cannot show that the questioning regarding the novel denied him a fair trial. Accordingly, Petitioner has failed to establish a denial of a federal right and has not met his burden of rebutting, by clear and convincing evidence, the presumption of correctness of the state *habeas* court's determination of factual issues, as required by 28 U.S.C. § 2254(e)(1). Therefore, Respondent's Motion for Summary Judgment with respect to this claim should be granted.

**Ground 7(a)/(1)**: Whether Petitioner's federal constitutional rights under the Fifth, Sixth, and Fourteenth Amendments were violated when the prosecutor made numerous improper remarks before the jury [including] (a) unlawfully attacking the Petitioner's constitutional rights to silence, to counsel, and to evidence.

Respondent notes that with respect to his Ground 7 sub-ground claims, Petitioner fails to identify or disclose actual facts supporting his allegations, relying solely on the speculative allegations themselves as his basis for relief. ECF No. 82 at 9. Further, Respondent contends, while Petitioner's direct appeal brief does clarify the specific errors Petitioner is alleging here, most of

the "errors" are merely based upon the prosecutor's permissible advocacy on behalf of the State.

Id.; see also ECF No. 52-14 at 59-72.

In evaluating Petitioner's claims, the WVSCA employed the four-factor analysis of Syl.

Pt. 6, State v. Sugg, 193 W. Va. 388, 456 S.E.2d 469 (1995):

> Four factors are taken into account in determining whether improper prosecutorial comment is so damaging as to require reversal: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

The WVSCA's four-factor analysis is adopted from the Fourth Circuit's reasoning in United States v. Harrison, 716 F.2d 1050, 1052 (4th Cir. 1983).

After reviewing all of Petitioner's Ground 7 claims of prosecutorial error, the WVSCA found that "[a]ny improper comments were isolated, were not deliberately placed before the jury to divert its attention to extraneous matters, and did not have a tendency to mislead the jury or prejudice the petitioner." ECF No. 52-15 at 30. Simply put, there was "no evidence of intentional prosecutorial misconduct." Id. at 29. Moreover, the WVSCA noted that the circuit court had properly instructed the jury that anything said by the lawyers during the trial is not to be considered evidence," and the jury is presumed to have proceeded accordingly.

Here, Petitioner's Ground 7(a)/(1) claim that prosecutorial misconduct occurred when the prosecutor unlawfully attacked Petitioner's constitutional right to silence has already been addressed in Petitioner's Ground 4 claim that the state impeached his credibility by fundamentally unfair means by attacking his post-Miranda silence, and found to lack merit, so it will not be considered again here.

The undersigned agrees with the WVSCA's legal and factual conclusion that the State did not commit reversible error. Petitioner has not shown that any prosecutorial misconduct occurred sufficient to warrant the overturning of his trial for prosecutorial misconduct on this ground, because that can only be done when such conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637 (1974). Here, Petitioner has not shown that the WVSCA's decision is an unreasonable application of federal law or an unreasonable determination of fact, and he is not  entitled to relief under 28 U.S.C. § 2254(d).

**Ground 7(b)/(2)**: Whether Petitioner's federal constitutional rights under Fifth, Sixth, and Fourteenth Amendments were violated when the prosecutor (b) used her position and status as an agent of the State to undermine the Petitioner's credibility and testimony, and to bolster the testimony of State witnesses.

As an initial point, the petition completely fails to identify what specific acts the Petitioner is alleging that the prosecutor committed regarding this claim.   See ECF No. 13-1 at 1 - 2. However, in his response in opposition to the Respondent's summary judgment motion, Petitioner references his *pro se* habeas petition, in which he elaborates, contending that the prosecutor "infused" into the trial her personal beliefs and opinions regarding Petitioner's credibility, his version of the events, and his guilt. More specifically, he points to the prosecutor's statement that "[i]f he doesn't sell the book, if he doesn't sell the story, he's facing a life sentence. He has a reason to create and craft the story. And that's what it is. It is a story." See ECF No. 52-32 at 41.  He also objects to the prosecutor's argument to the jury to the effect that

> [d]on't be convinced by somebody who takes the stand and somebody who is slick, can tell a story, can sit up there and weave his craft in front of you as if he's reading his own novel in his own mind each and every element, because ladies and gentlemen, a man who can kill a child, who can kill a child, can take that stand and that oath doesn't mean anything to him . . . It's a story, ladies and gentlemen, and that's what he told you.

ECF No. 52-32 at 42. Petitioner also objects to the prosecutor's statements to the effect that "[h]e lied. He didn't tell you the whole truth. He made up these individuals[.] [id. at 64];" "[l]adies and gentlemen, it's him. He burnt down that house to cover the crime. He executed those individuals for his own selfish reasons. That's what he did. [id. at 65];" and "[i]t's a story...It's all made up. It's carefully crafted to each and every point." Id. at 108.

On direct appeal, after reviewing what it described as "a long laundry list of allegedly improper comments made by the prosecutor," the WVSCA found no reversible error, given that "[a]ny improper comments were isolated, were not deliberately placed before the jury to divert its attention to extraneous matters, and did not have a tendency to mislead the jury or prejudice the petitioner." ECF No. 52-15 at 30. It found no evidence of intentional prosecutorial misconduct. Id. at 29. Further, it noted that "the [circuit] court properly instructed the jury that anything said by the lawyers during trial is not to be considered evidence," which marginalized any potential for undue prejudice. Id.

The undersigned concurs with the WVSCA's legal and factual conclusion that the state did not commit reversible error.  Most of what Petitioner alleges as "errors" are merely the prosecutor's permissible advocacy on behalf of the state. The Supreme Court has held that a trial can be overturned for prosecutorial misconduct only when such conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637 (1974). This Petitioner has not done. Further, Petitioner has not shown that the WVSCA's decision is an unreasonable application of federal law or an unreasonable determination of fact, and he is not entitled to relief under 28 U.S.C. § 2254(d).

**Ground 7(c)/(3)**: Whether Petitioner's federal constitutional rights under the United States Constitution's Fifth, Sixth, and Fourteenth Amendments were violated when the prosecutor made numerous improper remarks before the jury [including] (c) knowingly eliciting and utilizing false testimony to secure the Petitioner's conviction.

Again, the petition completely fails to identify what specific acts the Petitioner is alleging that the prosecutor committed regarding this claim.  See ECF No. 13-1 at 2. However, in his response in opposition to the Respondent's summary judgment motion, Petitioner references his *pro se* state habeas petition, in which he elaborates, contending that the prosecutor "bolstered" the "plainly false" testimony of the state's witness, Josepha Medina, citing to several lines from her closing argument, which were "major points of contention at trial," because it was Petitioner's position that "Medina was 'on the run' because he orchestrated the crime in question." ECF No. 52-16 at 97. He further objects to the prosecutor's statement that "Joseph Medina is not going to say anything because he's on the run. He's on the run because of the probation violation. He's not trying to go back to jail on that." See ECF No. 52-32.  He also points to the prosecutor's statement that "I think Mr. Medina told us exactly what he knew."   See ECF No. 52-32 at 107.

This claim is merely further iteration of Petitioner's Ground 3 claim that the state's knowing use of Joseph Medina's "false" testimony at trial was prejudicial, using additional similar statements by the prosecutor, statements that are legally permissible argument that were "well within the permissible bounds of advocacy," given that they were based upon evidence presented at trial.  It is without merit for the same reasons discussed in Ground 3, *supra*, and will not be given further review.  Summary judgment should be granted to the Respondent as to this claim.

**Ground 7(d)/(4) and 7(e)/(5)**: Whether Petitioner's federal constitutional under the Fifth, Sixth, and Fourteenth Amendments were violated when the prosecutor made numerous improper remarks before the jury [including] (d) presenting, under the guise of impeachment, knowingly irrelevant, legally inadmissible, and unduly prejudicial evidence in the form of a fictional novel authored by the Petitioner, and (e) knowingly and deliberately misstating, misrepresenting, and distorting scenes and narratives from the Petitioner's novel for the obvious purpose of unduly prejudicing the Petitioner.

These two claims are merely further iterations of Petitioner's Ground 5 claim that the state rendered Petitioner's trial fundamentally unfair by introducing "legally inadmissible and unduly

prejudicial" evidence to the jury in the form of a fictional novel previously authored by Petitioner. That claim has already been determined to have no merit; likewise, neither do these two. Accordingly, Petitioner is not entitled to relief.

**Ground 7(f)/(6)**: Whether Petitioner's federal constitutional rights under the Fifth, Sixth, and Fourteenth Amendments were violated when the prosecutor made numerous improper remarks before the jury [including] (f) deliberately misquoting numerous witness' testimony, including the Petitioner's, in order to unduly prejudice the Petitioner.

Again, the petition completely fails to identify what specific acts the Petitioner is alleging that the prosecutor committed regarding this claim.  See ECF No. 13-1 at 2. However, in his response in opposition to the Respondent's summary judgment motion, Petitioner references his *pro se* state habeas petition, in which he provides a long list of examples of alleged "deliberate" misstatements of evidence by the prosecutor he says were intended to prejudice him.  For example, he contends that during his cross examination, the prosecutor stated that state witness Katie Draughon testified that Petitioner told her that he had been robbed in the woods in Summer Hill; Petitioner denies that this was Draughon's testimony, and contends that this was a deliberate misstatement, intended to prejudice him.

A review of the Draughon's testimony reveals that she was a former girlfriend of Petitioner's; they had a six-year old son together; and that she testified that she spoke to Petitioner in the early morning hours of June 6, 2010, and again at 1:30 a.m. on June 7, 2010, when Petitioner called to say he had "exhausted all of his options," was scared, had been "attacked by his friends and robbed" and needed her to come and get him. ECF No. 52-29 at 221 – 225.  Draughon testified that she did not know exactly where Petitioner was at that time but thought he was in West Virginia. Id. at 225. She further testified that in a later conversation, Petitioner told her he was "in the woods near Summer Hill." Id. at 226.

Petitioner's contention that the prosecutor "intentionally altered" Draughon's testimony "in order to confuse and mislead the jury, and to illicitly cast doubt on the Petitioner's version of events regarding where and when he was attacked and robbed" fails to explain how this extraneous factual dispute would have confused the jury. Whether this alleged robbery happened in the woods in Summer Hill or outside of that area is of little consequence to the facts of the case, and if indeed it was a misstatement by the prosecutor, it was a trivial one, apparently unintentional. Petitioner has not even attempted to explain how this statement prejudiced him; the undersigned finds that it was an inconsequential misstatement. Assuming *arguendo* that the statement regarding where Petitioner was robbed, in the days after the crimes were committed was improperly admitted, Petitioner's contention that it deprived him of his constitutional right must fail; he cannot show it amounted to a due process violation.  "Whether the admission of prejudicial evidence constitutes a denial of fundamental fairness turns upon whether the evidence is material in the sense of a crucial, critical[,] highly significant factor."  Brown v. O'Dea, 227 F.3d 642, 645 (6th Cir. 2000). That is not the case here.

Next, Petitioner seizes upon a statement by the prosecutor to the effect that the state's witness John Willingham, a cab driver who drove him to Manassas, Virginia early in the morning of June 7, 2010, testified that the Petitioner had washed up at a gas station on the morning after the crime, as proof she deliberately misquoted Willingham's testimony to prejudice Petitioner, because Willingham had actually said no such thing. A review of Willingham's testimony reveals that Willingham testified that Petitioner was wearing "black clothes on and everything and [a] tank top" when he picked him up.  ECF No. 52-29 at 213. Willingham testified that they stopped once at a Sheetz store in "Berryville" and Petitioner appeared to have changed clothes at that time "because he had a shirt over his head."  Id. at 215.  This apparent unintentional misstatement of

evidence was inconsequential; whether Petitioner washed up or only changed his clothes on the ride to Manassas, Virginia is not material to the case, and clearly did not prejudice Petitioner in any way, nor has Petitioner shown how it could have. This claim is frivolous and should be dismissed.

Petitioner's response in opposition goes on to cite to several other allegedly improper comments by the prosecutor. See ECF No. 90 at 23 – 26. None of the statements were material to the prosecution or prejudicial to Petitioner. As noted by the WVSCA on appeal, "[a]ny improper comments were isolated, were not deliberately placed before the jury to divert its attention to extraneous matters, and did not have a tendency to mislead the jury or prejudice the petitioner. Therefore, we find that any improper comments made by the prosecutor do not constitute reversible error." ECF No. 52-15 at 30. Petitioner has not shown that the WVSCA's decision is an unreasonable application of federal law or an unreasonable determination of fact with regard to any of these prosecutorial statements, and he is not entitled to relief under 28 U.S.C. § 2254(d).

**Ground 7(g)/(7)**: Whether Petitioner's federal constitutional rights under the Fifth, Sixth, and Fourteenth Amendments, when the prosecutor made numerous improper remarks before the jury [including] (g) repeatedly arguing supposed facts not in evidence.

Again, the petition completely fails to identify what specific acts the Petitioner is alleging that the prosecutor committed regarding this claim. See ECF No. 13-1 at 2. However, in his response in opposition to the Respondent's summary judgment motion, Petitioner elaborates, contending that the prosecutor pointed out that the paramedics saw no soot on the infant Daronte's shirt, as would have been expected if he had really been lying on the mattress in a blazing inferno, next to his mother and brother's burning bodies, as Petitioner had testified; Petitioner contends that this was testimony was patently false because no paramedics testified at trial. See ECF No. 90 at 26 – 27.

44

At trial, Angela's mother Elizabeth Devonshire testified that when they found the baby on the patio that night, he was wearing a one-piece onesie outfit, that he was examined by EMS later, and that "[t]hey checked him and they said **that he had not been in the fire**." ECF No. 52-29 at 81 (emphasis added). Deputy Christopher Cochran of the Berkeley County Sheriffs Department also testified, that the onesie that infant Daronte was wearing when he was found was taken into evidence and given to Lt. Harmison. See ECF No. 52-28 at 222 – 23. Cochran further testified that the baby was checked out by paramedics and given oxygen, but appeared to be uninjured. Id. at 223 – 24. Lieutenant Gary Harmison testified in addition to being employed as a lieutenant in the criminal investigation division of the Berkeley County Sheriff's Department, he was also a member of the Berkeley County Fire Investigation Team and **a paramedic with the Berkeley County Ambulance Authority** [ECF No. 52-29 at 101 – 02 (emphasis added)]; that he received the infant's onesie/shirt from Deputy Cochran, photographed it, and sent it to the West Virginia State Police Crime Lab for testing. ECF No. 52-29 at 150 – 53. Jennifer Ann Howard, a forensic analyst at the West Virginia State Police Crime Lab testified that she examined the onesie, cut out sections of the stains on the onesie, determined they were blood, and sent them for further testing in the lab by others. ECF No. 52-30 at 7 – 13. Angela Gill of the DNA section of the West Virginia State Police Crime Lab also testified, stating that she tested the five cuttings from the infant's onesie and compared them to the saliva DNA samples obtained from Prophet and that four of the blood spots on the infant's onesie were consistent with Prophet's DNA. Id. at 14 – 25.

Petitioner's own testimony was that once he realized he could not get Angela and Andre's bodies out of the blazing apartment, he grabbed the infant Daronte and carried him out, and that **Daronte had no smoke or soot on him**. ECF No. 52-31 at 111, 153 – 54 (emphasis added).

Accordingly, in closing argument, the prosecutor showed the jury the infant's onesie/shirt, by then labeled as Exhibit No. 3 [ECF No. 52-28 at 222], noting

> [t]he other . . . thing that I want you to look at with that shirt [is] there's no evidence of soot.  If this child is in the house at the time that the fire was raging around him as he's laying on the mattress near where this burning body would have been[,] with the bathroom smoking and the room filling up with smoke[,] and being  there he should have had something on him and the paramedics see nothing.  There's nothing on that shirt, ladies and gentlemen.

ECF No. 52-32 at 59 – 60. Therefore, it is apparent that the specific testimony at trial regarding the lack of soot on the infant's onesie/shirt did not come from a paramedic, as the prosecutor apparently misstated, but rather, indirectly from Angela's mother when she testified as to what a paramedic had told her, and directly, from Petitioner himself.  Petitioner's claim that that this improper remark constituted prosecutorial misconduct for arguing facts not in evidence has no merit; the misstatement was understandable and an unintentional inconsequential mistake, based on the statement by Angela's mother regarding what paramedics told her. It did not deliberately misstate the critical point of the evidence, i.e., whether there was soot was found on the infant's shirt, and did not prejudice Petitioner in any way.  Moreover, from the absence of soot on the baby's shirt, the jury was free to conclude that Petitioner had carried the baby out *before* he set fire to the apartment, and not after.

Next, Petitioner objects to the prosecutor's statement that both Angela and Andre's throats had been cut, when there had been no testimony presented to show that Andre's throat had been cut. Id. at 27.  However, at trial, Petitioner himself testified that when he returned to the apartment the night of the murders, he saw Angela lying on the floor, face up, with her throat slit, and that little Andre was lying face down in a puddle of blood, motionless.  ECF No. 52-30 at 300 – 301. As noted *supra*, the medical examiner testified that Andre's body was so badly burned, a cause of death could not be determined. ECF No. 52-29 at 95 – 96. It was an obvious inference  for the jury

46

to conclude that the same fate that had befallen Angela had occurred to Andre; this conclusion was only possible when considering Petitioner's own testimony; no one else at trial witnessed Andre's body before it had been burned beyond recognition. The prosecutor's statement was a logical inference made "well within the permissible bounds of advocacy," given that the comments were based upon evidence presented at trial, including Petitioner's own testimony.

Finally, Petitioner contends that the prosecutor's statement that "[n]one of the neighbors hear this mystery car," was improper given that none of the neighbors testified at trial.  ECF No. 90 at 27.  At trial, there was testimony to the effect that the Devonshire home was on a private dead-end road in the country. ECF No. 52-29 at 10 -11.  Petitioner is incorrect that no "neighbor" testified at trial; Angela's parents were her neighbors. Angela's father Sidney Devonshire, who lived in a house next door to the apartment on his property that Petitioner torched, testified that he had heard nothing before the emergency personnel banged on his door at 4:45 a.m. when the fire was already in full blaze, and despite having slept with his window open, that he had not heard or seen the headlights of any car, truck, or vehicle before that.   ECF No. 52-29 at 16 – 18. Likewise, Angela's mother, who also lived at the same residence, also testified that she was up at one o'clock in the morning of June 6, 2010, and again at three o'clock, that all was quiet and dark, and that she saw no cars or people moving about when she looked out the window toward Angela's garage apartment either time. Id. at 75.

Accordingly, it is apparent that these three statements were not misstatements, or at worst, were unintentional, minor misstatements, that were not material to the prosecution, or were not prejudicial to Petitioner.  As the WVSCA noted, "[a]ny improper comments were isolated, were not deliberately placed before the jury to divert its attention to extraneous matters, and did not have a tendency to mislead the jury or prejudice the petitioner." ECF No. 52-15 at 30.  Petitioner has

not shown that the WVSCA's decision is an unreasonable application of federal law or an unreasonable determination of fact, and he is not entitled to relief under 28 U.S.C. § 2254(d).

**Ground 7(h)/(8)**: Whether Petitioner's federal constitutional rights under the United States Constitution's Fifth, Sixth, and Fourteenth Amendments were violated when the prosecutor made numerous improper remarks before the jury [including] (h) inundating the jury with improper remarks during closing arguments.

Again, the petition completely fails to identify what specific acts the Petitioner is alleging that the prosecutor committed regarding this claim.  See ECF No. 13-1 at 2. However, in his response in opposition to the Respondent's summary judgment motion, Petitioner elaborates on this claim, again contending that the prosecutor repeatedly suggested that he had concocted a fabricated version of the events only after studying the evidence provided to him by the state, the same claim Petitioner already addressed in Ground 4 and 5, both of which were found to have no merit.  Accordingly, it will not revisited here. Summary judgment should be granted to the Respondent on this claim.

**Ground 7(i)/(9)**: Whether Petitioner's federal constitutional rights under the Fifth, Sixth, and Fourteenth Amendments were violated when the prosecutor made numerous improper remarks before the jury [including] (i) engaging in other misconduct that unduly prejudiced the Petitioner.

Again, the petition completely fails to identify what specific acts the Petitioner is alleging that the prosecutor committed regarding this claim.  See ECF No. 13-1 at 2. However, in his response in opposition to the Respondent's summary judgment motion, Petitioner elaborates, alleging that the prosecutor "unethically reneged" on the stipulation regarding introducing his fictional novel at trial; argued that "all the pieces" of Petitioner's story fit with the discovery because he had crafted his story that way; and again alleged that Petitioner had had the opportunity to study the evidence for two years before testifying.

These are all claims which have been previously addressed in Grounds 4 and 5 and found to lack merit. Accordingly, they will not revisited here. Summary judgment should be granted to the Respondent on this claim.

## B. Judicial Misconduct:

**Ground 6**: Whether Petitioner's federal constitutional rights under the Fifth, Sixth, and Fourteenth Amendments were violated when the trial court refused to give the jury an instruction on the defense's theory of the case.

Petitioner contends that before trial, he proffered a proposed jury instruction to the court regarding his theory of the case, which the court "improperly and unconstitutionally denied," thereby depriving him of his constitutional right to have a jury of his peers fairly decide whether his theory of the case raised a reasonable doubt as to his guilt.  See ECF No. 13-1 at 1.

A review of the trial transcript indicates the following exchange took place before the jury was re-convened for the final day of trial:

THE COURT:  Morning.  Let's go on and I understand there' s some objections to instructions.

MR. PREZIOSO: Well, Judge, if I could. I read through here. I didn't even find a typographical error in any of these instructions. I think they are, in complete candor to the Court, correct, and the way you said it malice, I don't have any problem or objection with that because there's different malice for the murder and then the arson.

**I went out and spoke to Mr. Prophet. He reviewed the instructions. He sought to have his own instruction added that I submitted to Court and Counsel. Again, the law is what I typed up. To give you an understanding is [sic] from** *State versus Dodds* **[sic] which is a case that is overruled. I don't know if it's necessary to offer this. I think it's contemplated in the reasonable doubt instruction; however, Mr. Prophet wanted to make a record of that and wanted to offer it into the record**.

THE COURT: **I don't think it's a correct statement of the law. I don't think that it's required that all reasonable opportunity by others to have committed the crime is the standard**.  The State doesn't have the burden and the evidence doesn't [sic] that all reasonable opportunity by others to have committed it need be proved. It may be why it was overruled. I understand it went further on to direct versus circumstantial, but that statement as it's taken in isolation like that is number

one, impractical because there's not a requirement of proof beyond all possible doubt.

MR. PREZIOSO:  I explained it to him the way that they're still required, of course, to prove guilt beyond a reasonable doubt.  I explained that to him. Just note our objection to it.

THE COURT: I will. I will note that it's not given.

ECF No. 52-32 at 4 – 5 (emphasis added).

Petitioner raised this claim as Ground 4 on direct appeal, arguing that the circuit court erred by refusing to give an instruction based upon the language of Syl. Pt. 2, State v. Dobbs.[19] That syllabus point reads:

2. Criminal Law -- Circumstantial Evidence
Circumstantial evidence will not support a guilty verdict, unless the fact of guilt is proved to the exclusion of every reasonable hypothesis of innocence; and circumstances which create only a suspicion of guilt but do not prove the actual commission of the crime charged, are not sufficient to sustain a conviction.

Id. at 163 W. Va. 630, 631, 259 S.E.2d 829, 830 (W.Va. 1979) *overruled by* State v. Guthrie, 194 W. Va. 657, 668, 461 S.E.2d 163,174 (W.Va. 1995).

Jury instructions are generally matters of state law and procedure which do not invoke federal constitutional guarantees. See Estelle v. McGuire, 502 U.S. at 71-72, 112 S.Ct. at 482 ("[T]he fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief."); Gilmore v. Taylor, 508 U.S. 333, 349-50, 113 S.Ct. 2112, 2121-22, 124 L.Ed.2d 306 (1993). "[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." Marshall v. Lonberger, 459 U.S. 422, 423, 103 S.Ct. 843, 845, 74 L.Ed.2d 646 (1983). When circumstances impede the fundamental fairness of the trial which impinge on constitutional protections however, erroneous state jury instructions are

---

[19] State v. Dobbs, 163 W. Va. 630, 259 S.E.2d 829 (W.Va. 1979) *overruled by* State v. Guthrie, 194 W. Va. 657, 668, 461 S.E.2d 163,174 (W.Va. 1995).

properly presented on federal *habeas* review. Id. The proper inquiry therefore, is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Cupp v. Naughten, 414 U.S. at 147, 94 S.Ct. at 400-01.

Here, Petitioner complains that an instruction was *not* given. However, as the state court concluded, the instructions given by the trial judge were a correct statement of the law, and the instructions fully and fairly set forth the applicable law. As noted by the Respondent, providing the circuit court the requisite "broad discretion" afforded it by Syl. Pt. 4, State v. Guthrie, 194 W. Va. 657, 461 S.E.2d 163 (1995), the WVSCA also recognized that law supporting Petitioner's proffered instruction had been expressly overruled by Syl. Pt. 4, Guthrie, and the requirement that all elements of a crime be proven beyond a reasonable doubt. Thus, the refusal to give the requested instruction did not "so infect the entire trial that the resulting conviction violates due process." Estelle v. McGuire, 502 U.S. at 72 (*quoting* Cupp v. Naughten, 414 U.S. at 147). Consequently, it was not error for the trial judge to refuse to give the instruction requested by Petitioner that was based on an incorrect statement of the law. See Sutton v. Bell, 683 F. Supp. 2d 640, 712 (E.D. Tenn. 2010). Because Petitioner's requested instruction was no longer a correct statement of law, and because the WVSCA determined Petitioner's Ground Six on an independent and adequate state law ground, Petitioner is not entitled to relief under 28 U.S.C. § 2254 and summary judgment should be granted to Respondent.

**Ground 8(a)/(1)**: Whether Petitioner's federal constitutional rights under the Fifth, Sixth, and Fourteenth Amendments were violated when the trial court engaged in bias and misconduct and made prejudicial remarks before the jury, by (a) prior to trial, making an improper, passionate, and extremely prejudicial and biased remark in open court regarding his opinion of the Petitioner's guilt and culpability in the crimes at issue.

This claim is frivolous. The "improper, passionate, and extremely prejudicial and biased remark" that Petitioner claims was made in open court in front of the jury before trial (described

in Ground 7(a) on appeal, in Ground 8(a) in Petitioner's *pro se* habeas petition, and in Ground 9(a)

in his amended petition), was a statement made by the court *in a pre-trial hearing*, the day before

trial, well before any jury had been convened.  See ECF No. 52-14 at 72 – 73; ECF No. 52-16 at

116; and ECF No. 52-18 at 87 - 88.  Thus, it was impossible for the jury to have heard it. This

claim should be dismissed.

**Ground 8(b)/(2)**: Whether Petitioner's federal constitutional rights under the Fifth, Sixth, and
Fourteenth Amendments were violated when the trial court engaged in bias and misconduct and
made prejudicial remarks before the jury, by (b) prior to trial, deliberately, improperly, and
prejudicially manipulating, or otherwise coercing, a State witness [Joseph Medina] into artificially
strengthening the State's case against the Petitioner.

This claim, likewise, is frivolous. The allegedly  "improper coercion" of the state's witness,

Joseph Medina, regarding the circuit court's rejecting Medina's potential plea deal in order to force

him to testify at Petitioner's trial would necessarily have had to have taken place long before any

jury was ever convened.  See ECF No. 52-14 at 73 – 74; ECF No. 52-16 at 115, 118 - 120; ECF

No. 52-18 at 87 - 89. Thus, it would have been impossible for the trial court to have made any

prejudicial remarks in front of the jury regarding this issue. This claim should be dismissed.

**Ground 8(c)/(3)**: Whether Petitioner's federal constitutional rights under the Fifth, Sixth, and
Fourteenth Amendments were violated when the trial court engaged in bias and misconduct and
made prejudicial remarks before the jury, [when] (c) during jury selection, [the court] improperly
and prejudicially refused to strike two biased jurors for cause, one of which ended up on the
Petitioner's impaneled jury. See ECF No. 13-1 at 2.

This is claim is merely another iteration of Petitioner's Ground Two claim that the trial

court improperly and prejudicially refused to strike two challenged jurors for cause, a claim that

has already been dismissed with prejudice as procedurally barred. See ECF No. 73 at 29. Thus it

will not be given review.

**Ground 8(d)/(4)**: Whether Petitioner's federal constitutional rights under the Fifth, Sixth, and
Fourteenth Amendments were violated when the trial court engaged in bias and misconduct and
made prejudicial remarks before the jury, by (d) during cross-examination, permitting the

prosecutor, under the guise of impeachment, to present knowingly irrelevant, legally inadmissible, and unduly prejudicial evidence to the jury in the form of a fictional novel that had been stipulated out.

This is claim is merely another iteration of Petitioner's Ground 5 claim that the state rendered Petitioner's trial fundamentally unfair by introducing "legally inadmissible and unduly prejudicial evidence to the jury in the form of a fictional novel previously authored by Petitioner.

As noted by the WVSCA, "[m]ost of the petitioner's argument is a rehashing of the assignments of error presented by the petitioner's counsel and addressed by this Court above. The remainder of petitioner's argument consists of frivolous assertions of bias which this Court deems wholly unnecessary to address." ECF No. 52-15 at 30. Because Petitioner's Ground 5 claim has already been determined to have no merit, likewise, neither does this one. Accordingly, Petitioner is not entitled to relief on this claim.

**Ground 8(e)/(5)**: Whether Petitioner's federal constitutional rights under the Fifth, Sixth, and Fourteenth Amendments were violated when the trial court engaged in bias and misconduct and made prejudicial remarks before the jury, by (e) during cross-examination, permitting the prosecutor, over defense objection, to attack the Petitioner 's post-Miranda silence.

This is merely another iteration of Petitioner's Ground 4 claim that the state committed prosecutorial misconduct when it impeached the Petitioner's credibility by fundamentally unfair means and by attacking his post-Miranda silence. That claim has already been determined to have no merit; likewise, neither does this one. Accordingly, Petitioner is not entitled to relief.

**Ground 8(f)/(6), (g)/(7), (h)(8), and (i)/(9)**: Whether Petitioner's federal constitutional rights under the Fifth, Sixth, and Fourteenth Amendments were violated when the trial court engaged in bias and misconduct and made prejudicial remarks before the jury, by (f) during cross-examination, accusing the Petitioner, in front of the jury, of being "argumentative," inconsistent, and evasive in his answers to the prosecutor, (g) not dutifully, under State law, intervening to limit and attempting to correct the prosecutor's improprieties during closing arguments; (h) attempting to guide and advise the prosecutor throughout the entirety of the case on how to successfully conduct the prosecution of her case against the Petitioner, and (i) engaging in other more subtle, though no less prejudicial, conduct to the detriment of the Petitioner. See ECF No. 13-1 at 2.

The Supreme Court has long held that a "defendant is entitled to a fair trial but not a perfect one, for there are no perfect trials." Brown v. United States, 411 U.S. 223, 231–32 (1973) (citation omitted). Thus, the issue here is not whether Petitioner received a perfect trial, but whether the WVSCA's decision affirming the denial of Petitioner's judicial bias claims was contrary to clearly established law "beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011). This requires Petitioner to demonstrate that his trial judge's comments and interruptions during trial made "fair judgment impossible." Liteky v. United States, 510 U.S. 540, 555 (1994); see also Rowsey v. Lee, 327 F.3d 335, 341 (4th Cir. 2003) ("In order to prevail in a deprivation of due process claim, a [petitioner] must show a level of bias that made 'fair judgment impossible.'" (citation omitted)).

Due process secures a criminal defendant's right to an impartial trial judge. Larson v. Palmateer, 515 F.3d 1057, 1067 (9th Cir. 2008) (citing In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955)); Montgomery v. Uchtman, 426 F.3d 905, 910 (7th Cir. 2005) (citing same); Layer v. Lyles, 598 F. Supp. 95, 98 (D. Md. 1984). "The general presumption is that judges are honest and impartial." Montgomery, 426 F.3d at 910.

In assessing judicial impartially, the Fourth Circuit has accepted that a judge is not merely a spectator at trial; rather, a judge must ensure that the presentations of counsel are not confusing to the jury and that trials do not become "protracted and costly affairs," even if that means that the trial judge must interrupt counsel. United States v. Smith, 452 F.3d 323, 332 (4th Cir. 2006); see also United States v. Ecklin, 528 F. App'x 357, 362 (4th Cir. 2013). "'A judge's ordinary efforts at courtroom administration-even a stern and short-tempered judge's ordinary efforts at courtroom administration' . . . do not establish bias or partiality." United States v. Castner, 50 F.3d 1267, 1274 (4th Cir. 1995) (quoting Liteky v. United States, 510 U.S. 540, 556, 114 S.Ct. 1147, 127

L.Ed.2d 474 (1994)). In addition, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge . . . they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible" Liteky, 510 U.S. at 555.[20] A trial judge's participation during trial, however, should "never reach the point at which it appears clear to the jury that the court believes the accused is guilty." Ecklin, 528 F. App'x at 362 (citations and markings omitted); see also United States v. Bencivengo, 749 F.3d 205, 216 (3rd Cir. 2014). Ultimately, "[t]o prevail on a claim of judicial misconduct, [Petitioner] must show that the state trial judge's conduct was so fundamentally unfair as to deprive [him] of [his] constitutional right to due process," and this task is an onerous one. Paccione v. New York, 353 F. Supp. 2d 358, 368 (E.D.N.Y. 2005).

As a preliminary point, the petition completely fails to identify what allegedly improper judicial acts Petitioner is referencing in his Ground 8(f)/(6) claim. See ECF No. 13-1 at 2. However, in his response in opposition to the Respondent's summary judgment motion, Petitioner provides some specificity to this claim, giving several examples from the trial record where the court interrupted his responses to the prosecutor to tell him to "answer the question" or "don't be argumentative," and finally "[l]et's get something straight here. You're not going to tell me what you're doing or not. Answer her question specifically. See ECF No. 90 at 36 – 38.

On appeal, these claims were noted by the WVSCA and deemed to be "frivolous assertions of bias which this Court deems wholly unnecessary to address." ECF No. 52-15 at 30. The

---

[20] While Liteky concerned the federal recusal statute, federal courts have looked to it for guidance in resolving habeas claims of judicial bias. See, e.g., Willis v. Lafler, No. 05-74885, 2007 WL 3121542, at *22 (E.D. Mich. Oct. 24, 2007).

undersigned agrees. Indeed, at trial, the newly-empaneled jury was specifically instructed by the court that

> [a]nything I do shouldn't be considered by you as to how I think you should decide any of the facts.  That's totally your 50 percent. My 50 percent is instructing you as to what the law is and ruling on the admissibility of the evidence at other trial procedure matters.

ECF No. 52-28 at 181.  Further, the court noted

> [d]uring . . . trial the attorneys may object to certain questions and request that certain matters be struck out of . . . evidence. Please do not let any of my rulings or the manner of my rulings in that in any way influence how I think you should decide any matter of fact. My job is to make sure that the trials conform to the law of the land. The opinions as to the outcome so long as it's done correctly doesn't [sic] matter to me so don't misinterpret any of my actions to think that's how you should decide the case.

Id. at 186.  Here, a careful review of the trial transcript reveals that the court's statements were nothing more than "ordinary efforts at courtroom administration," when Petitioner clearly was failing to answer questions asked; as such, they did not rise to the level of bias or partiality. Castner, 50 F.3d at 1274 (quoting Liteky v. United States, 510 U.S. at 556). The trial court's conduct was not so egregious as to deprive Petitioner of a fair trial in front of an impartial jury.

Petitioner's Ground 8(g)/(7) claim that the court did not dutifully intervene under state law, to limit and/or attempt to correct the prosecutor's improprieties during closing arguments is merely another attempted reiteration of the multiple sub-grounds of prosecutorial misconduct raised in Ground 7, already addressed *supra*, and found to be completely without merit, thus, they will not be given further review.   Moreover, on appeal, the WVSCA noted that

> petitioner has presented us with a long laundry list of allegedly improper comments made by the prosecutor. After considering each comment, this Court finds no reversible error. Any improper comments were isolated, were not deliberately placed before the jury to divert its attention to extraneous matters, and did not have a tendency to mislead the jury or prejudice the petitioner.

ECF No. 52-15 at 30. Accordingly, it declined to find that any of the prosecutor's comments constituted reversible error. Id.

Similarly, the petition completely fails to identify what allegedly improper, specific judicial acts comprise Petitioner's Ground 8(h)/(8) claim that the trial court was overly deferential toward the prosecutor throughout the trial, attempting to guide and advise her to obtain Petitioner's conviction. However, Petitioner's response in opposition elaborates, describing an instance during which the court and prosecutor discussed the admissibility of the evidence of Petitioner's anonymous call to 911 three days before the crimes, when he reported that Joseph Medina was going to kill a family. ECF No. 90 at 40 – 42; ECF No. 52-27 at 8 – 15. However, it is apparent that this exchange did not take place *during* trial; it took place during a discussion on evidentiary issues in a July 9, 2012 motions hearing, one day before trial began, wherein the state was wanting to exclude evidence of the call and the defense was wanting it in.  The statements Petitioner quotes [see ECF 90 at 40 – 41] are merely the court's expressions of surprise that the state did not want the evidence of the 911 call in, because clearly, the evidence of the call could cut both ways, and could lead a jury to view the call as evidence of Petitioner's premeditation.

This claim has no merit; the court was not colluding in some fashion with the state; to the contrary, the court advised both parties on the pros and cons of their positions and the admissibility of the evidence.  See ECF No. 52-27 at 4 – 41.  Petitioner also posits that discussion during a sidebar, outside of the jury's hearing, on the third day of trial, between the prosecutor, defense counsel, and the court regarding the admissibility of the evidence of the fictional novel suggests that the court was providing "hint[s]" to the prosecutor, to misrepresent the evidence regarding the novel.  See ECF No. 90 at 42.  The subject of the admissibility of the fictional novel has already

been exhaustively addressed *supra*, in Petitioner's Ground 5 and 7(e) claims of prosecutorial misconduct; there is no merit to this frivolous claim and it will not be given further review.

Finally, Petitioner's Ground 8(i)/(9) claim that the court engaged in other more subtle, though no less prejudicial, conduct that was prejudicial to Petitioner. Again, the petition completely fails to identify what "subtle" prejudicial conduct Petitioner alleges occurred. However, Petitioner's response in opposition elaborates somewhat, alleging that during a July 9, 2012 motion hearing the day before trial, the trial court advised the defense "that it was incumbent upon the defense to inform the prosecutor of their anticipated defense prior to trial, as the prosecutor was apparently surprised by and had not anticipated Petitioner's possible defense to the charges against him, and that this was somehow unfair to the prosecutor and her case." See ECF No. 90 at 42 – 43; see also ECF No. 52-27 at 20 - 28.  A review of the transcript of that July 9, 2012 motion hearing merely reveals further discussion of evidentiary issues for trial, including the potential use of the anonymous 911 call Petitioner made, three days before the crimes, reporting that Joseph Medina was going to kill a family, i.e., the linchpin of Petitioner's theory of the case: that Medina had committed or orchestrated the crimes. ECF No. 52-27 at 20 - 28.   This issue has already been addressed in Petitioner's Ground 8(h)/(8) claim, *supra*.  Because that claim has already been given review, it will not be revisited here.

As further evidence of the trial court's "subtle" prejudicial behavior, Petitioner also references his *pro se* habeas petition, where he alleged that the trial court looked away from him when he testified, instead of attentively watching, as the court did with other witnesses, "to make clear to those watching his demeanor that he neither liked nor believed" Petitioner, and that the only time the court looked at Petitioner was to "scowl at, interrupt, or chastise" him. ECF No. 52-16 at 134.   Further, Petitioner alleges that at a crucial point in the defense's closing argument, the

court "suddenly, and very loudly, shouted out: "[t]en minutes left." Id. Petitioner alleges that this was intentionally done to interrupt the flow of counsel's argument, distract the jury, and "issue a subtle warning" to defense counsel 'not to argue Medina's possible culpability to the jury."  Id.  A careful review of the record shows no such "subtle" bias, merely the occasional appropriate interventions necessary to manage a trial and control the courtroom; nothing that "reveal[s] such a high degree of favoritism or antagonism as to make fair judgment impossible" Liteky, 510 U.S. at 555. The undersigned agrees with the WVSCA that these are "frivolous assertions of bias which this Court deems wholly unnecessary to address." ECF No. 52-15 at 30.

Finally, as further proof of the trial court's "subtle" prejudicial conduct, Petitioner reiterates the many points of alleged judicial conduct already raised and addressed in Ground 8(g)/(7) [ECF No. 52-16 at 135]; as such, those will not be given further review here.

The Court therefore finds that because the WVSCA decided these four frivolous assertions of judicial on independent and adequate state law grounds, Petitioner is not entitled to relief under 28 U.S.C. § 2254 and summary judgment should be granted to Respondent.

## C. Sufficiency of the Evidence

**Ground 9**: Whether Petitioner's federal constitutional rights under the United States Constitution's Fifth, Sixth, and Fourteenth Amendments were violated when he was convicted by evidence insufficient to establish his guilt beyond a reasonable doubt for every element of the charged crime.

In reviewing the sufficiency of the evidence to support a state criminal conviction on a due process challenge in a federal habeas proceeding, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307 (1979).

A careful review of the records indicates that there was more than ample evidence upon which a reasonable trier of fact could have found the essential elements of the crimes beyond a reasonable doubt.  The overwhelming evidence indicated that Petitioner arrived to spend the night with Angela and her children on June 5, 2010; was last seen with them at around 9:00 p.m.; and remained there until their deaths and the fire in the early morning hours of June 6, 2010. ECF No. 52-15 at 7, 18. Further, cell phone evidence presented at trial supported Medina and his girlfriend's testimony that they were nowhere near Angela's apartment that night [ECF No. 52-29 at 147 - 48], and that Petitioner was. Id. at 149 - 50. Petitioner's cell phone records show at least four outbound calls to Medina's phone between 2:06 a.m. and 4:46 a.m.  ECF No. 52-19 at 144.  A witness at trial testified he was driving by at around 4:30 a.m., saw the flames, and called 911.  ECF No. 52-28 at 207-08. The 911 operator testified that the call came in at 4:36 a.m. that day.  Id. at 211 – 12. There was a gap in the calls from Petitioner's phone to Medina's between 2:09 a.m. and 4:46 a.m., leading to the inference that that the crimes were committed shortly before 2:06 a.m., and then between 2:09 a.m. and 4:46 a.m., the baby was removed from the apartment, the fire set, and Petitioner fled. Id. Petitioner continued to attempt to call Medina repeatedly throughout the entire day and evening of June 7, 2010.  ECF No. 52-29 at 144.

Moreover, in his argument for judgment of acquittal after the defense rested, Petitioner conceded that there was enough evidence to convict him of second degree murder [ECF No. 52-15 at 16; see also ECF No. 52-30 at 215 - 16], leaving only evidence of premeditation to be proven. The WVSCA found that the testimonial and inferential evidence was sufficient to support the jury's finding that Petitioner premeditated his crimes. See generally ECF No. 52-15 at 18.

Specifically, the WVSCA found that (1) the jury could infer that Petitioner had sufficient time to formulate the intent to kill his victims; (2) the victim's mother's testified that all was quiet

and the curtains were pulled so tight that no light escaped from them when she looked out at 3:00 a.m. on June 6, 2010, inferring that Petitioner had pulled the curtains tightly so no one would witness the killings, further evidence of intent; (3) Petitioner's communications with Joseph Medina and his attempts to shift the blame for the killings to Medina in advance, by anonymously calling 911, Martinsburg City Police, and Berkeley County Sheriff's Department three days before the murders, reasonably suggested that Petitioner planned the murders [see ECF No. 52-15 at 18]; Medina's testimony was that Petitioner told him afterwards that after he caught Angela going through his pockets "he did what he had to do [ECF No. 52-30 at 95 – 96]" a virtual admission to the murders; and finally, that "a reasonable person could infer that after killing Angela, the petitioner killed Andre because [he] . . . knew that Andre, but not infant Durante, could identify him. . . ." ECF No. 52-15 at 19. Based upon this evidence, the undersigned finds that there was more than sufficient evidence to support Petitioner's convictions, and that he is entitled to no relief on this basis.

**D. <u>Ineffective Assistance of Counsel</u>**

As previously noted, Petitioner alleges that his right to counsel was violated because trial counsel was ineffective in multiple ways. When a petitioner brings an ineffective assistance of counsel claim, counsel's conduct is measured under the two-part analysis in <u>Strickland</u>.

"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." <u>Id.</u> at 687. "Deficient performance is not merely below-average performance; rather, the attorney's actions must fall below the wide range of professionally competent performance." <u>Griffin v. Warden, Maryland Corr. Adj. Ctr.</u>, 970 F.2d 1355, 1357 (4th Cir. 1992).

Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. In order to demonstrate prejudice, Petitioner must show that but for his attorney's errors, the result of the proceeding would have been different. Strickland, 466 U.S. at 687. Error by counsel which falls short of the constitutional ineffectiveness standard does not constitute cause, notwithstanding that the error may arise from inadvertence, ignorance, or strategic choice. Murray v. Carrier, 477 U.S. 478 (1986).

Moreover, as the Court has made clear, this review is done through the lens of § 2254, as modified by the Anti-Terrorism and Effective Death Penalty Act (AEDPA). In looking at ineffective assistance claims through this lens, the pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself. Harrington v. Richter, 131 S. Ct. 770, 785 (2011) (internal citation omitted). Congress intended for AEDPA to raise the bar for relief in a 2254 case because it deals with claims that have already been litigated in state court. Id. at 786. Accordingly, "even a strong case for relief does not mean that state court's contrary conclusion was unreasonable. Id. (citing Lockyer v. Andrade, 538 U.S. 63, 71 (2003)).

**Ground 10(a)/(1)**: Whether Petitioner's federal constitutional rights under the United States Constitution's Fifth, Sixth, and Fourteenth Amendments were violated by the ineffective

assistance of his state-appointed trial counsel, when counsel: (a) failed to  thoroughly and independently investigate the crime at issue.

While the petition offers no insight into counsel's alleged failure to investigate [ECF No. 13-1 at 3], Petitioner's response in opposition to Respondent's summary judgment motion [ECF No. 90 at 44] references his February 2, 2015 *pro se* state habeas petition,  wherein he enumerated 3 deficiencies in counsel's performance in this regard: 1) counsel's failure to search the woods for "blood evidence" to corroborate his claim that he had fled from the two intruders and hidden there; 2) counsel's failure to immediately locate and interview Medina, who Petitioner contended was "integrally involved in this crime;" and 3) failure to timely investigate Petitioner's claim that he had made calls to 911 and the other law enforcement agencies several days before the crimes occurred. See ECF No. 52-16 at 144 – 45.

These claims will be examined in turn.

At the conclusion of Petitioner's circuit court habeas proceedings, the court found that Petitioner supplied little to no evidence that trial counsel was unprepared or otherwise failed to investigate prior to trial.  The circuit court noted that Petitioner's claim that counsel should have searched for Petitioner's blood in the woods failed to show "that his blood was [actually] in the woods, where the blood was in the woods, that he notified counsel to investigate where to search for blood, that counsel refused to search for blood, or that finding his blood in the woods somehow would have affected the outcome of the trial." ECF No. 52-21 at 10. The undersigned would further note that even assuming *arguendo* that Petitioner had done so, it still overlooks the fact that after the crimes were committed, Petitioner fled and was not apprehended for almost two weeks. At some point thereafter, counsel was appointed to represent him. By the time counsel could reasonably have begun any investigation, the probability of finding blood spatter in a densely wooded area exposed to the elements for several would be unlikely.

Petitioner's next allegation that trial counsel's investigation was substandard because counsel did not immediately contact Medina fails to support his claim with any evidence that the result of his trial would have been any different, even if counsel had done so. It is clear that Medina was a witness for the state at trial, and counsel vigorously challenged his testimony on cross examination and re-cross on July 12, 2012 [ECF No. 52-30 at 97 – 139, 146]; further, Medina was recalled to the stand the following day as a rebuttal witness, and counsel again subjected him to cross-examination.  See ECF No. 52-31 at 198 – 207.

Finally, Petitioner's claim that counsel was deficient for not immediately investigating Petitioner's claim that he had made anonymous calls to 911 and the other law enforcement agencies several days before the crimes occurred is likewise unsupported; Petitioner cannot show that he was prejudiced thereby, given that counsel did, in fact investigate it and the evidence was introduced at trial, where it served as both a sword and a shield, given that Petitioner's attempt to point the blame at Medina for murders that had not yet happened ended up providing grounds for the jury to view the calls as an indication of Petitioner's intent to implicate Medina for the murders he planned to commit himself, i.e., premeditation.

After a careful review of the record, the undersigned finds that the circuit court's conclusion that Petitioner failed to show that counsel rendered ineffective assistance as a result of his pretrial investigation was not based upon an unreasonable determination of facts or an unreasonable application of federal law. Petitioner has neither proven that counsel's representation was deficient or that it prejudiced him at trial.

**Grounds 10(b)/(2) and 10(c)/(3)**: Whether Petitioner's federal constitutional rights under the United States Constitution's Fifth, Sixth, and Fourteenth Amendments were violated by the ineffective assistance of his state-appointed trial counsel, when counsel: (b) failed to failed to file a pretrial motion to suppress the introduction of the Petitioner's violent fictional novel entitled

Enter the Fire: Seven Days in the Life, and (c) failed to failed to request that a limiting instruction be given to the jury informing them that the Petitioner's fictional novel was to be limited to a specific and legitimate purpose to impeach and was not to be used as evidence of a material or substantive fact.

These related claims, further iterations of Petitioner's Ground 5 claim of prosecutorial misconduct and his Ground 8(d)/(4) claim of judicial misconduct, albeit now brought under the rubric of counsel's ineffectiveness, have no more merit than the underlying Ground 5 and Ground 8(d)/(4) claims.

Notably, in this Ground 10(b)/(2) claim, Petitioner omits mention of the fact that the record clearly indicates that counsel, recognizing the potential prejudicial impact of the contents of his novel early on, attempted to minimize it; there was a pretrial discovery conference on the matter, for which defense counsel thoroughly researched the issue and argued on Petitioner's behalf, attempting to prevent the use of the novel at trial. ECF No. 52-31 at 17. The parties had stipulated before trial that the state was prohibited from using the fictional novel in its opening statement or its case in chief, but that the state would be free, subject to the rules of evidence, to refer to the novel in any rebuttal that it might present. See WVSCA opinion on appeal, ECF No. 52-15 at 12. The stipulation was honored; the prosecutor did not inquire into the similarities of the fictional novel until the *defense's* case in chief, a permissible use of the novel. ECF No. 52-21 at 16 – 17. Counsel objected on the basis of the stipulation and relevancy, but the circuit court determined that such questioning was permissible because the stipulation did not prevent using the novel during cross-examination, and that the novel was relevant to Petitioner's credibility. See WVSCA opinion on appeal, ECF No. 52-15 at 13.

Further, in its June 28, 2015 Order denying Petitioner's amended state habeas petition, the circuit court correctly noted that at trial, counsel repeatedly objected to the state's use of Petitioner's book as evidence, preserving it as an issue for appeal, and that the trial court "heard

extensive argument on the use of the book." ECF No. 52-21 at 11. The circuit court reasoned that "[i]t is clear that trial counsel tried to preclude the use of the book at trial, and that [even] had trial counsel done so with a written motion *in limine*, the trial court's ruling would not have been different." <u>Id.</u> Moreover, the court noted, even if the novel had been precluded altogether on cross-examination, "it is unlikely that the result of the trial would have been different." <u>Id.</u> Finally, this claim is frivolous; it is apparent from the record, that far from being ineffective, counsel advocated vigorously on Petitioner's behalf on this issue.

As for Petitioner's Ground 10(c)/(3) claim that trial counsel was ineffective for failing to request a limiting instruction regarding  the use of his fictional novel at trial, the circuit court found that under the West Virginia Rules of Evidence, evidence of Petitioner's book "was direct rebuttal evidence and not simply to impeach the credibility of [Petitioner]." ECF No. 52-21 at 12. Thus, "a limiting instruction would not have been appropriate." <u>Id.</u> Because trial counsel's actions with regards to Ground 10(c)/(3) were not error, they are by definition not subject to a <u>Strickland</u> analysis. Further, by virtue of being preserved for direct appellate review through trial counsel's actions, this claim, too, is frivolous.

Accordingly, there is no evidence to suggest that counsel's conduct with regards to either of these claims was either objectively unreasonable or unduly prejudicial to Petitioner. The circuit court's ruling is neither an unreasonable determination of the facts, nor an unreasonable application of federal law, and this claim should be dismissed.

**Grounds 10(d)/(4) - 10 (l)/(12):** Whether Petitioner's federal constitutional rights under the United States Constitution's Fifth, Sixth, and Fourteenth Amendments were violated by the ineffective assistance of his state-appointed trial counsel, when counsel failed to failed to object to, and move for a mistrial for, the prosecutor's improper and unconstitutional questions regarding Petitioner's post-<u>Miranda</u> pre-trial silence.

These claims are merely reiterations of Plaintiff's Ground 4 claim of prosecutorial misconduct on the same issue, and his Ground 8(e)/8(5) claim of judicial misconduct for permitting the same, already analyzed *supra,* and found to lack merit.

Because no prosecutorial misconduct occurred, no judicial misconduct was committed by permitting in the prosecutor's line of questioning on these issues; therefore, there was no basis for counsel's failure to object to, or move for a mistrial over the same.  Moreover, as correctly noted by Respondent and apparent from the record, the circuit court found that trial counsel *did* object to the State's questioning of his pre-arrest silence, and that by doing so, preserved the issue for direct appeal. ECF No. 52-21 at 12. Further, the circuit court acknowledged that the WVSCA found that such questioning was not error. Id. Thus, trial counsel's actions were not objectively unreasonable and were not unconstitutionally prejudicial. These sub-grounds are frivolous and should be dismissed.

Respondent contends that Petitioner's claim that trial counsel was ineffective for failing to object to the prosecutor's closing remarks has no merit; while the circuit court acknowledged that trial counsel did not object during the prosecutor's closing remarks, it noted that that the WVSCA concluded that the prosecutor's statements were not improper or unfairly prejudicial. Id. The circuit court also recognized that "whether to object to prejudicial statements in a closing argument is a tough call for a trial attorney, because an objection will only shine a light on the prejudicial statement, especially if the objection is overruled." Id. Moreover, the circuit court reasoned that the prosecutor's challenge to Petitioner's credibility during closing remarks was supported by the evidence. Id.

The circuit court's categorization of objections as part of ordinary trial strategy is a presumption supported by Strickland. Thus, a finding that counsel would refrain from objecting

during closing remarks to prevent "shining a light" on harmful statements is not unreasonable. Because trial counsel's failure to object to the prosecutor's closing remarks was not objectively unreasonable, and because the prosecutor's remarks were actually supported by the evidence proffered during trial, Petitioner fails both prongs of the <u>Strickland</u> standard. The circuit court's determination of the same was neither an unreasonable determination of fact nor an unreasonable application of federal law.

**Ground 10(m)/(13):** Whether Petitioner's federal constitutional rights under the Fifth, Sixth, and Fourteenth Amendments were violated by the ineffective assistance of his state-appointed trial counsel, when counsel: (m) failed to object to, and to move for a mistrial for, prosecutor's other improper and unconstitutional remarks made during closing arguments.

This is merely a reiteration of the same claim raised in Ground 4 as prosecutorial misconduct and in Ground 8(e)/8(5), as judicial misconduct for permitting the same, both of which have already been analyzed and found to lack merit. Because no prosecutorial misconduct was committed, there was no judicial misconduct associated with permitting the same; therefore, counsel cannot be found ineffective for failing to object to and move for mistrial over these issues. This claim is frivolous and should be dismissed.

**Ground 10(o)/(15):** Whether Petitioner's federal constitutional rights under the Fifth, Sixth, and Fourteenth Amendments were violated by the ineffective assistance of his state-appointed trial counsel, when counsel (o) failed to object to, and move for a mistrial for, the trial court's many instances of blatant bias and misconduct. <u>See</u> ECF No. 13-1 at 3 – 4.

Respondent argues that Petitioner's claim that counsel was ineffective for failing to object to the circuit court's alleged instances of misconduct lacks merit. This sub-ground fails for the same reasons set forth in Petitioner's Ground 8 sub-grounds claims of judicial bias/misconduct. The circuit court did not engage in misconduct; thus trial counsel's actions (or inaction) regarding any such alleged misconduct and any unconstitutional prejudice to Petitioner stemming therefrom are nonexistent. Summary judgment should be granted to Respondent.

**Ground 10(p)/(16):** Whether Petitioner's federal constitutional rights under the Fifth, Sixth, and Fourteenth Amendments were violated by the ineffective assistance of his state-appointed trial counsel, when counsel: (p) failed to object to a myriad of prejudicial circumstances throughout the entirety of the trial. ECF No. 13-1 at 3, 5.

The petition sheds no light on what the "myriad of prejudicial circumstances" counsel allegedly failed to object to.  See ECF No. 13-1 at 5. Petitioner's response in opposition also fails to flesh out this claim.  ECF No. 90 at 47 – 48.  Respondent, assuming that Petitioner's Ground 10(p)/(16) claim addresses the circuit court's findings in its Order Denying Petition for Habeas Corpus [ECF No. 52-21 at 13), contends that Petitioner's claim in this regard lacks merit, because Petitioner fails to show that any "prejudicial circumstances" (1) actually occurred, (2) were actually and unconstitutionally prejudicial, and (3) were not addressed by the court or trial counsel.

The undersigned agrees. Because Petitioner fails to support sub-ground 10(16), he cannot show that trial counsel's performance was deficient under either prong of the Strickland standard. Moreover, mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. Eason v. Thaler, 73 F.3d 1322, 1325 (5th Cir. 1996). This claim should be dismissed.

## E. Cumulative Error

**Ground 11:** Whether Petitioner's federal constitutional rights under the Fifth, Sixth, and Fourteenth Amendments were violated by the cumulative effect of multiple trial errors . . . [including]: (a)/(1) EACH AND EVERY INDIVIDUAL  AND COLLECTIVE ASSERTION AND ARGUMENT OF ERROR MADE IN GROUNDS  1 - 10 OF **THIS** PETITION ABOVE; (b)/(2) the prosecutor for the State failing to provide pre-trial notice of its intent to use 404(b) evidence against the Petitioner; (c)/(3) the trial court failing to change the venue of the trial due to massive pre-trial publicity adverse to the Petitioner; and (d)/(4) State witness Lt. Harmison deliberately and unnecessarily informing the jury during his testimony that the Petitioner was being held in the local regional jail. (emphasis in original).

Petitioner's Ground (a)/(1) claim is that the cumulative effect of the alleged misconduct of the prosecutor, the court, and trial counsels' individual actions, which standing alone, might not warrant relief, collectively amount to cumulative error.

Although the Court recognizes that "[t]he cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error" and that "[t]he purpose of a cumulative-error analysis is to address that possibility," United States v. Rivera, 900 F. 2d 1462, 1469 (10th Cir. 1990), a "legitimate cumulative-error analysis evaluates only the effect of matters actually determined to be constitutional error." Fisher v. Angelone, 163 F.3d 835, 853 n. 9 (4th Cir. 1998).

Here, because the Court has not found any individual constitutional errors with regard to any of Petitioner's prosecutorial or judicial misconduct claims, let alone any of his ineffective assistance of trial counsel claims set forth in Grounds 3 – 10 of the petition, a cumulative-error analysis is neither necessary nor appropriate. See Id. at 853 ("Having just determined that none of counsel's actions could be considered constitutional error . . . it would be odd,  to say the least, to conclude that those same actions, when considered collectively, deprived Fisher of a fair trial.").

The petition sheds no light whatsoever on what 404(b) evidence Petitioner refers to in his Ground 11(b)/(2) claim [see ECF No. 13-1 at 5]; nor does Petitioner's response in opposition. See ECF No.  90 at 48. A review of the *pro se* habeas petition likewise is not illuminating. See ECF No. 52-16 at 157 - 58. Again, liberal construction of *pro se* petitions has its limits.  This claim does not meet the heightened pleading required of a habeas petition. "[N]otice pleading is not sufficient, for the petition is expected to state facts that point to a real possibility of constitutional error. It does not require those courts to conjure up questions never squarely presented to them. District judges are not mind readers." Beaudett, 775 F.2d at 1278.  This conclusory allegation is insufficient to defeat a motion for summary judgment. Eason v. Thaler, 73 F.3d 1322, 1325 (5th Cir. 1996). Because the undersigned cannot determine what the substance of Petitioner's Ground 11(b) claim is, it will not be given review.

The Ground 11(c) claim regarding the court's failure to change the venue of trial due to the "massive pre-trial publicity" has already been dismissed as procedurally barred and will not be considered here.

Finally, as for Petitioner's Ground 11(d) claim that in his testimony, state witness Lt. Gary Harmison deliberately and unnecessarily informed the jury that the Petitioner was being held in the local regional jail, the petition provides no argument in support of this claim, nor does he explain how it is cumulative error. See ECF No. 13-1 at 5.  Nor does Petitioner's response in opposition to the Respondent's summary judgment motion illuminate the claim. ECF No. 90 at 48. Although his response in opposition does reference his *pro se* habeas petition regarding the claim, there is nothing there to explain how Harmison's fleeting implied reference to Petitioner being in jail,[21] assuming the jury noticed it at all, prejudiced him before the jury, either, given the other overwhelming evidence of his guilt presented at trial.  See ECF No. 52-16.  Accordingly, this claim, like Petitioner's Ground 11(b) claim, is so insufficiently pled, the undersigned cannot address it. While district courts are required to construe *pro se* complaints liberally, "[d]istrict judges are not mind readers." Beaudett, 775 F.2d at 1278. Unsupported conclusory allegations are not competent summary judgment evidence.  See Eason v. Thaler, 73 F.3d at 1325.

## F. Ineffective Assistance of Appellate Counsel

"The standard for reviewing a claim of ineffectiveness assistance of appellate counsel is the same as when reviewing the effectiveness of trial counsel." Lucas v. McBride, 505 F. Supp. 2d 329, 350 (N.D. W.Va. 2007); see also Smith v. State of South Carolina, 882 F.2d 895 (4th Cir.

---

[21] On cross exam, during a discussion about Petitioner's cell phone, defense counsel elicited an admission from Lt. Harmison to the effect that the state had only recently obtained possession of the cell phone Petitioner had used during the day of the crimes, because the phone had been in the custody of the sheriff's office since 2010; Harmison replied "[i]t was actually in his [Prophet's] property at the regional jail system."  ECF No. 52-29 at 163 - 64.

1989), *cert. denied*, 493 U.S. 1046 (1990). The Supreme Court, in applying the Strickland factors

to appellate counsel's performance, has held that a defendant:

> must first show that his counsel was objectively unreasonable, in failing to find
> arguable issues to appeal - that is, that counsel unreasonably failed to discover
> nonfrivolous issues and to file a merits brief raising them. If [the defendant]
> succeeds in such a showing, he then has the burden of demonstrating prejudice.
> That is, he must show a reasonable probability that, but for his counsel's
> unreasonable failure to file a merits brief, he would have prevailed on his appeal.

Smith v. Robbins, 528 U.S. 259, 285, 120 S. Ct. 746, 764, (2000). Moreover, the Sixth

Amendment does not require that appellate counsel raise every nonfrivolous issue on appeal. In

fact, the Supreme Court has recognized the importance of "having the appellate advocate examine

the record with a view to selecting the most promising issues for review." Jones v. Barnes, 463

U.S. 745, 752 (1983). Instead, "[w]innowing out weaker arguments on appeal and focusing on

those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective

advocacy." Smith v. Murray, 477 U.S. 527, 536 (1986) (internal quotations omitted). Additionally,

in reviewing appellate counsel's performance, the court "must accord appellate counsel the

'presumption that he decided which issues were most likely to afford relief on appeal.'" Bell v.

Jarvis, 236 F.3d 149, 164 (4th Cir. 2000) (*quoting* Pruett v. Thompson, 996 F.2d 1560, 1568 (4th

Cir. 1993)). Therefore, counsel has great latitude to decide what issues to press in post-conviction

proceedings, Cole v. Branker, 2008 WL 5999766 *9 (4th Cir. 2008). Finally, the Supreme Court

has noted that, when arguing that appellate counsel failed to raise a particular claim, it is

"possible," but "difficult to demonstrate that counsel was incompetent." Smith, 528 U.S. at 288

(citing Gray v. Greer, 800 F.2d 644, 656 (7th Cir. 1986) ("Generally, only when ignored issues are

clearly stronger than those presented, will the presumption of effective assistance of counsel be

overcome.").

**Grounds 12(a)/(1), and 12(b)/(2):** Whether Petitioner's federal constitutional rights under the Fifth, Sixth, and Fourteenth Amendments were violated by the ineffective assistance of his . . . appellate counsel, when appellate counsel failed to: (a) present certain grounds on appeal that were obviously stronger than those presented and (b) present federal constitutional questions or cite to United States Supreme Court authority**.**

Here, on appeal, counsel raised seven assignments of error, challenging the sufficiency of the evidence, the state's use of Prophet's novel, and the prosecutor's alleged comments on Prophet's post-arrest silence. ECF No. 52-14 at 5, 8, 39, 45. Appellate also challenged the circuit court's refusal to give Prophet's proffered jury instruction on his theory of defense, as well as the State's "knowing[]" presentation of allegedly "false and perjured" testimony. Id. at 48; 50-58. Finally, appellate counsel advanced claims of prosecutorial and judicial misconduct based on allegedly "improper remarks" made by the prosecutor and trial judge. Id. at 58-72; 72-78.

Especially in light of the rule that counsel need not raise every colorable claim [Jones, 463 U.S. at 754], it was not objectively unreasonable for Prophet's appellate counsel to focus on these seven grounds, and their accompanying sub-grounds. See Cole, 328 F. App'x at 159; see also Jones, 463 U.S. at 753 ("A brief that raises every colorable issue runs the risk of burying good arguments."). Thus, Prophet has not overcome the presumption that counsel merely "winnow[ed] out" weaker claims on appeal in order to focus on those he felt were more likely to prevail, or established that the claims "ignored" on appeal were "clearly stronger than" those raised. Gray, 800 F.2d at 656. At best, he "has shown that these claims could have been raised on direct appeal, not that they should have been raised, or that they were more meritorious than those presented." Howard, 2009 WL 1872970, at *15.

Accordingly, Petitioner has failed to overcome the presumption against finding appellate counsel incompetent for choosing to omit a particular argument. Not only has Petitioner failed to identify any additional claim that appellate could have made, he has offered nothing to

demonstrate that Counsel's choices of appellate claims were anything more than tactical decisions that were reasonable under the circumstances. In his state-court habeas proceedings, Petitioner alleged only a "blanket assertion that the appeal was weakly presented" without identifying particular facts to show why appellate counsel's performance was deficient, or what issues he might have been raised instead of those he did raise. Not surprisingly, the circuit court denied relief. The circuit court's finding that appellate counsel rendered effective assistance based upon the presumption that counsel's actions were effective comports with the holding of Cole v. Branker.

Finally, Petitioner's Ground 12(b)/Ground 12(2) claim that appellate counsel was ineffective for not presenting federal constitutional claims is frivolous. Counsel argued federal law wherever applicable in a state law proceeding. As recognized by the circuit court, "counsel did argue the 'constitutional underpinnings regarding Petitioner's right to remain silent.'" See ECF No. 52-21 at 14.

Therefore, the undersigned finds that Prophet's appellate counsel performed "within the wide range of reasonable professional assistance" [see Strickland, 466 U.S. at 689; Jones, 463 U.S. at 754] and recommends that these claims be dismissed.

### G. Denial of Meaningful Appellate and Post-Conviction Collateral Review

**Ground 13**: Whether Petitioner's federal constitutional rights under the Fifth and Fourteenth Amendments were violated when the . . . [WVSCA] violated its state constitution so as to deny the Petitioner a state-created liberty interest, and when it failed to provide the Petitioner meaningful appellate and post-conviction collateral review.

The undersigned agrees with Respondent that this claim is frivolous. See ECF No. 82 at 21. A review of the enormous record in this case confirms that Petitioner has been afforded the same full panoply of constitutional rights provided to every convicted criminal defendant. He received not one but *two* appointed trial counsel, appointed appellate counsel, and appointed

habeas counsel, a direct appeal, post-conviction proceedings, and a post-conviction appeal. He was permitted to file a direct appeal brief, a *pro se* habeas petition, then an amended petition by counsel, and finally, a brief to the WVSCA, challenging the circuit court's denial of habeas relief. Both the circuit court and the WVSCA issued opinions/orders fully addressing Petitioner's claims. Petitioner was permitted to file all of his claims before the state courts, as evidenced by the extensive docket for this massive federal petition. Petitioner has been afforded great latitude with regard to his insufficiently-pled, overly-large filings in this matter, and has received extensions of time wherever possible. Merely because his claims were correctly found to be meritless does not imply a constitutional rights violation. This claim has no absolutely merit and should be dismissed.

## IV.   Recommendation

For the reasons previously set forth, the undersigned recommends that the Respondent's Motion for Summary Judgment [ECF No. 81] be **GRANTED** and that the petition [ECF 13] be **DENIED** and **DISMISSED without prejudice for failure to state a claim upon which relief can be granted.**

Further, the undersigned recommends that Petitioner's pending motion to expedite review [ECF No. 93] be **DENIED as moot**.

**Within fourteen (14) days** after being served with a copy of this report and recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made. Objections shall identify each portion of the magistrate judge's recommended disposition that is being challenged and shall specify the basis for each objection.  Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitation, consistent with LR PL P 12.  A copy of any objections should also be submitted

to the United States District Judge.  **Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation.**  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk is directed to send a copy of this Report and Recommendation to the *pro se* Petitioner by certified mail, return receipt requested, to his last known address as shown on the docket and to transmit a copy electronically to all counsel of record.

This Report and Recommendation completes the referral from the district court.  The Clerk is directed to terminate the Magistrate Judge's association with this case.

DATED: February 21, 2019

/s/ *Michael John Aloi*
MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE